IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

No. 97-31037

TEXAS EASTERN TRANSMISSION CORPORATION,

Plaintiff-Appellee,

versus

AMERADA HESS CORPORATION,

Defendant-Appellant

********************************************************************

AMERADA HESS CORPORATION,

Plaintiff-Appellant,

versus

TEXAS EASTERN TRANSMISSION CORPORATION,

Defendant-Appellee.

Appeal from the United States District Court
for the Eastern District of Louisiana

July 7, 1998

Before HIGGINBOTHAM, PARKER and DENNIS, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Amerada Hess Corp. appeals a summary judgment in favor of Texas Eastern Transmission Corp. This case requires us to interpret a gas substitution clause in a "take or pay," gas purchase contract. Reading the contract as a whole, the district court concluded that the contract restricts the quantity of gas substituted from another lease to the amount of gas produced from the leaseholds and lands dedicated to the contract. We agree.

I.

Amerada Hess owns an undivided interest in the natural gas produced from a federal offshore mineral lease at South Pass Block 89, which is located in federal waters off the coast of Louisiana. The Marathon Oil Company is the operator and a co-working interest owner with Amerada Hess of the SP 89 Lease. Texas Eastern is a natural gas pipeline company which purchases, sells, and transports natural gas. Amerada Hess produces natural gas from oil and gas reservoirs in the outer continental shelf.

The present dispute is over the proper construction of a gas substitution clause in a twenty-year, "take-or-pay" gas purchase contract between Amerada and TX Eastern, dated April 1, 1982, as amended in 1991 and 1992.

The 1982 contract is based on an Advance Payment Agreement entered into by the parties in 1971. In 1971, there were critical shortages of natural gas for customers served by interstate pipelines, such as TX Eastern. The AP agreement was made under the

2

auspices of the Advance Payment Program, which the Federal Power Commission set up in order to encourage pipelines to contribute funds for exploration and development of gas reserves.

Under the AP agreement, TX Eastern advanced Amerada $5.5 million to explore and develop natural gas from seven offshore leases that Amerada owned in the Gulf of Mexico. In return, TX Eastern had the option to buy any gas found on the designated leases. In 1981 Amerada found oil and gas under South Pass Block 89, and in 1982 the parties executed a twenty-year contract in which TX Eastern agreed to take or pay gas produced from the SP 89 Lease, explicitly identified in the contract as the "contract area."

In the 1980s the natural gas market underwent dramatic changes, and in 1989 TX Eastern sued Amerada to terminate the 1982 gas purchase contract. In 1991, pursuant to a 1990 settlement arising from this lawsuit, the parties amended the 1982 contract by limiting to 15 Bcf the volume of gas that TX Eastern was required to buy from the Northern Area of SP 89, and by reducing the price for gas under the contract, in exchange for a $21.6 million payment by TX Eastern to Amerada.[1] In 1992, pursuant to a buyout agreement, the parties further amended the 1982 contract to terminate all remaining purchase obligations for gas produced from

---

[1] Attachment "A" to the 1991 amendment to the 1982 contract clearly delineates the boundary between the Northern and Southern Areas of South Pass 89.

3

the Northern Area of SP 89, in exchange for a $19.3 million payment by TX Eastern to Amerada.

Article III, paragraph 5 of the 1982 contract, referred to as the "Gas Substitution Clause," states:

> [Amerada] shall have the right at its election during the term of this Agreement to *substitute other gas for all or a portion of the gas hereunder* and *the right to deliver such substitute gas* to [Texas Eastern] at mutually agreeable points in the area of or downstream of delivery points set forth in this Agreement, provided the substituted source contains reserves and deliverability equal to or in excess of the reserves under the leases originally committed to this Agreement.

This substitution clause was included in the 1971 Advance Payment Agreement, was incorporated into the 1982 contract and has since remained in the contract without modification for the last 16 years.

Paragraph 8 of Article IV (entitled "Quantity of Gas") in the 1982 contract, as amended in 1990, states:

> [I]t is understood and agreed that *nothing in this Agreement shall be construed to require* [Amerada] to sell and deliver to *[Texas Eastern] or [Texas Eastern] to purchase or pay for on any day a quantity of gas in excess of the total quantity of gas per day which the wells on the leaseholds and/or lands covered by this Agreement are capable of producing* into [Texas Eastern]'s line . . .

The scope of the gas committed to the 1982 contract, as amended in 1990, is defined in Article II, paragraph 1, as that gas produced from specific "leaseholds and/or lands" above a specific depth, namely:

4

the leaseholds and/or lands which [Amerada] now owns or controls in said Block 89 Field, South Pass Area, Offshore Louisiana, as described in Exhibit "A" and shown on Exhibit "A-1" attached hereto, *from the surface down to the base of the deepest hydrocarbon bearing reservoir* or its correlative zone encountered in said block as of the date hereof [April 1, 1982].

Exhibits "A" and "A-1" attached to the 1982 contract define the designated "contract area" as the geographic area covered by "Block 89, South Pass Area, South and East Addition, Offshore Louisiana."

When the SP 89 contract was executed in 1982, TX Eastern and Marathon, as operator of the SP 89 Lease, estimated that there were 176 billion cubic feet ("Bcf") of proven and possible gas reserves in the geographic area covered by the SP 89 Lease.[2] By March 1997, 194 Bcf of gas had been produced, with another 9 Bcf of proven reserves estimated to be recoverable thereafter from the Southern Area of SP 89.

In 1995, Amerada began production in another newly developed OCS lease area, referred to as the "South Pass 87 D Development Area." Amerada's estimated gas production from April 1997 through the expiration of the 1982 contract on November 30, 2002 is more than twenty times greater for the SP 87 D Development Area than for the Southern Area of SP 89.[3]

---

[2] The evidence on record indicates that of the 176 Bcf of gas reserves in South Pass 89, 137 Bcf are proven gas reserves and the remaining 39 Bcf represent possible gas reserves.

[3] The record indicates that the recoverable proven gas reserves from the SP 87 D Development Area, as of April 1997, is 178 Bcf which exceeds the 1981 initial estimates for the total possible and proven gas reserves from SP 89 of 176 Bcf.

5

In February 1997, after TX Eastern had been purchasing gas from the SP 89 Lease for fifteen years, Amerada advised TX Eastern by letter that, pursuant to its alleged right under the gas substitution clause in Article III, paragraph 5 of the contract, it intended to substitute 100 percent of its gas reserves and deliverability from its interests in the South Pass 87 D Development Area for 100 percent of its gas reserves previously dedicated to the contract from the SP Block 89 Area. Thus, TX Eastern's take-or-pay obligations from February 21, 1997 through to November 30, 2002, when this contract expires, would be determined by the enormous production potential from the South 87 D Development Area rather than the nearly depleted gas reserves in the Southern Area of SP 89. Under this scenario, by exercising its alleged gas substitution right, Amerada could double the total volume of gas sold during the 20-year contract term and TX Eastern would be required to buy an additional 43 Bcf of gas and pay Amerada an extra $624 million.[4]

TX Eastern replied that Amerada was entitled to tender, as substitute gas from another source, a volume of gas equivalent to all or a portion of Amerada's gas that was being produced from the

---

[4] The incentives are large. The 1997 gas price under the contract, as amended in 1991, was $9.857/MMBtu. In comparison, the prevailing spot market price for gas produced in the Louisiana coastal area for the first five months of 1997 averaged $2.36/MMBtu. Moreover, the gas price under the contract increases by 10 percent annually (each January 1st) resulting in a contract price of 15.875/MMBtu by the year 2002.

SP Block 89 Lease.  In other words, while Amerada could substitute specific volumes of gas from the SP 89 Lease for gas from another source, it could not substitute one gas source with another source, without any volume limitations.  For the moment, in their response TX Eastern agreed to accept the gas deliveries from the SP 87 D Development Area "with a full reservation of rights."

Amerada then filed a declaratory judgment action in state court in Harris County, Texas, which was first removed to the Southern District of Texas and subsequently transferred to the Eastern District of Louisiana.  Two days after Amerada filed suit, TX Eastern filed a declaratory judgment action in the Eastern District of Louisiana.  These suits were consolidated.  Shortly thereafter, with limited discovery, both parties moved for summary judgment, arguing that the SP 89 gas purchase contract was unambiguously in their favor.  TX Eastern submitted the affidavits of several scientists and law professors including Dr. Saul Litvinoff, Professor Shael Herman, and Professor L. Linton Morgan, who testified on custom and usage in the oil and gas industry.  The district court denied Amerada's motion to strike much of this evidence as being extrinsic to the contract.  In a thirty-eight page order granting TX Eastern's motion for summary judgment and denying Amerada's motion for summary judgment, the district court stated:

> Reading the Substitution provision, Article III, Paragraph 5, in conjunction with Article IV, Paragraph 8,

7

the Court concludes that there is a limit on the total amount of gas that can be delivered or can be paid for.

The district court concluded that, under the provisions of the SP 89 contract, Amerada could not substitute gas from the SP 87 D Lease in excess of the quantity of gas produced by the SP 89 Lease per day.

The district court entered a judgment in favor of TX Eastern and against Amerada for $11,282,826.19, plus court costs and prejudgment interest. This appeal followed. We have jurisdiction under 28 U.S.C. § 1291.

II.

A.

This court reviews a grant of summary judgment *de novo*. See Montgomery v. Brookshire, 34 F.3d 291, 294 (5th Cir. 1994). "The construction of an unambiguous contract is reviewed *de novo,* but while interpretation of an unambiguous contract is a question of law, clear error is the standard of review when a district court uses extrinsic evidence to interpret an ambiguous contract." Tarrant Distribs., Inc. v. Heublein, Inc., 127 F.3d 375, 377 (5th Cir. 1997) (citations omitted). A district court's rulings regarding evidence it will consider in deciding a motion for summary judgment are reviewed for abuse of discretion. See Richardson v. Oldham, 12 F.3d 1373, 1376 (5th Cir. 1994).

8

The gas subject to the purchase contract at issue is from a federal lease on the outer continental shelf, off the coast of Louisiana. The parties agree that under the mandatory choice-of-law provision in the Outer Continental Shelf Lands Act, 43 U.S.C. §§ 1333(a)(2)(A), 1349(b)(1), construction of this contract is governed by Louisiana law, to the extent that such law is not inconsistent with federal law. See <u>Union Tex. Petroleum Corp. v. PLT Eng'g, Inc.</u>, 895 F.2d 1043, 1050 (5th Cir.), <u>cert. denied</u>, 498 U.S. 848 (1990).

B.

Under Louisiana law, the interpretation of an unambiguous contract is an issue of law for the court. See <u>Rutgers, State Univ. v. Martin Woodlands Gas Co.</u>, 974 F.2d 659, 661 (5th Cir. 1992). "When the words of the contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." La. Civ. Code Ann. art. 2046 (West 1995). In addition, a contract provision is not ambiguous where only one of two competing interpretations is reasonable or merely because one party can create a dispute in hindsight. See <u>Lloyds of London v. Transcontinental Gas Pipe Line Corp.</u>, 101 F.3d 425, 429 (5th Cir. 1996); <u>Rutgers</u>, 974 F.2d at 662. This court has stated that when the contract is not ambiguous, it has no authority to reach beyond the four corners of the document.

9

See <u>Huggs, Inc. v. LPC Energy, Inc.</u>, 889 F.2d 649, 653 (5th Cir. 1989).

On the other hand, a contract is ambiguous, under Louisiana law, "when it is uncertain as to the parties' intentions and susceptible to more than one reasonable meaning under the circumstances and after applying established rules of construction." <u>See</u> <u>Lloyds of London</u>, 101 F.3d at 429. Under these rules of construction, "[e]ach provision of a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole." La. Civ. Code Ann. art. 2050 (West 1987). Contract provisions susceptible to different meanings should be interpreted "to avoid neutralizing or ignoring any of them or treating them as surplusage," <u>Lambert v. Maryland Cas. Co.</u>, 418 So. 2d 553, 559-60 (La. 1982), and "to preserve validity [of the contract]," <u>Gibbs Constr. Co. v. Thomas</u>, 500 So. 2d 764, 769 (La. 1987). Louisiana courts will not interpret a contract in a way that leads to unreasonable consequences or inequitable or absurd results even when the words used in the contract are fairly explicit. <u>See</u> <u>Makofsky v. Cunningham</u>, 576 F.2d 1223, 1229 (5th Cir. 1978). "A doubtful provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties." La. Civ. Code Ann. art. 2053 (West 1987).

10

This dispute centers around the scope of the gas substitution clause in Article III, paragraph 5 of the contract. While the vicissitudes of supply and demand in the natural gas industry over the past three decades are a tiger in the reeds beside our path, we must limit our travel to the four corners of the contract. Article III, paragraph 5 states:

> [Amerada] shall have the right at its election during the term of this Agreement to *substitute other gas for all or a portion of the gas hereunder* and *the right to deliver such substitute gas* to [Texas Eastern] at mutually agreeable points in the area of or downstream of delivery points set forth in this Agreement, provided the substituted source contains reserves and deliverability equal to or in excess of the reserves under the leases originally committed to this Agreement.

Both TX Eastern and Amerada agree that Amerada has a right to substitute under the contract. They dispute what the object is that may be substituted. TX Eastern states that the object is gas while Amerada urges that the object is leaseholds, lands or both. This translates into a dispute over the quantity of gas that may be substituted under the contract.

Amerada contends that it has the right to substitute a new gas source, the SP 87 D Lease, for the SP 89 Lease originally committed to the contract. Relying on the words "the *substitute source* contains reserves and deliverability equal to or in excess of the reserves under the *leases originally committed* to this Agreement" in the gas substitution clause, Amerada urges that since SP 89 was

11

the lease originally committed under this contract, it has a right to find a "substitute source," a new gas lease, to replace the lease originally committed.

TX Eastern contends that, while this clause gives Amerada the right to substitute, the words "to substitute other gas for all or a portion of the gas hereunder" means that Amerada may substitute volumes of gas that materialize from the SP 89 Lease with volumes of gas from another source provided two conditions are met: that source contains reserves in excess of SP 89 reserves and the substitute gas is delivered at mutually agreeable points.[5] TX Eastern asserts that, if the parties had intended to allow the addition of new leases, they would not have used the term "substitute gas" in the gas substitution clause, rather they would used the words "substitute leaseholds and/or leases." Since the "object" of this gas purchase agreement is a movable – gas "after [it] leaves the wellhead," Hawthorne Oil & Gas Corp. v. Continental Oil Co., 377 So. 2d 285, 287 (La. 1979), according to TX Eastern, the right to substitute gas is a right to only substitute movables as opposed to immovables, such as leaseholds or lands. TX Eastern also notes that the SP 87 D Leases that Amerada seeks to substitute did not exist in 1982, and the first production of gas from them occurred in mid-1995.

---

[5] Neither party disputes that the substituted source, South Pass 87 D, contains reserves in excess of the reserves under South Pass Block 89 and its delivery point is in the area of or downstream from the delivery points for South Pass Block 89.

12

We agree with TX Eastern that the gas substitution clause only permits gas to be substituted with other gas. While this clause uses the words "substitute gas" and "substituted source," it only refers to the right to substitute other gas and does not state or imply any right to substitute gas *sources*. Indeed, the words "substituted source" appear in this clause only when explicitly stating a condition that must be satisfied in order to exercise the right to substitute gas, namely, that the substitute source must contain reserves that are greater than or equal to the reserves in the SP 89 Lease.

Amerada forcefully protests that the gas substitution clause does not explicitly state any volume restrictions or specifications in order to exercise its right to substitute gas. We are persuaded that the words "substitute other gas for all or a portion of the gas hereunder" restrict volume because they indicate that a portion or all of the total volume of gas may be replaced by other gas. It is difficult to impute any other meaning to the words "for all or a portion of the gas." As we read the gas substitution clause, any substitute gas must be at least comparable in volume and availability to the gas produced from the dedicated SP 89 Lease.

This is the most natural and common sense reading of the contract. Amerada's interpretation of the contract leads to absurd consequences. Under its interpretation, Amerada would be permitted

to substitute a new and untapped source of gas[6] as and when the existing gas source becomes depleted, thereby requiring TX Eastern to take or pay for a virtually unlimited quantity of gas produced by Amerada during the contract's twenty-year term.  Amerada could then potentially receive a $621.9 million windfall by substituting a newly developed gas source for the depleted reserves of SP 89. See Shell Offshore, Inc. v. Marr, 916 F.2d 1040, 1048, 1048 n.7 (5th Cir. 1990) (noting that one contracting party "on the strength of one provision of [an a]greement" could not "tak[e] unfair advantage of [the other party] and enrich [it]self at the [other party]'s expense, in direct conflict with the definition of equity in Louisiana Civil Code Article 2055.").  That an agreement proves to be a poor bargain offers no escape from its obligations.  A contract allocates risk.  That does not make the consequences of an urged interpretation irrelevant in the effort to find its meaning. To the point, Amerada's position is implausible as it runs afoul of various other provisions in the contract.

Article IV, Paragraph 8, which limits TX Eastern's overall purchase obligation, states in pertinent part:

> [I]t is understood and agreed that *nothing in this Agreement shall be construed to require [Amerada] to sell*

---

[6]    While exercising its substitution right, Amerada must satisfy the two conditions spelt out in the gas substitution clause.  Any new gas source substituted by Amerada must contain reserves and deliverability equal to or in excess of the reserves under the SP 89 Lease, and the substitute gas must be delivered at mutually agreeable points in the area of or downstream of delivery points set forth in the contract.

14

> *and deliver to [Texas Eastern] or [Texas Eastern] to*
> *purchase or pay for on any day a quantity of gas in*
> *excess of the total quantity of gas per day which the*
> *wells on the leaseholds and/or lands covered by this*
> *Agreement are capable of producing into [Texas Eastern]'s*
> *line . . .*

TX Eastern contends that this clause limits the amount of gas that it is obligated to purchase to a quantity equal to the volume of gas produced by the leaseholds and/or lands covered by the SP 89 contract, namely, the Southern Area of the SP 89 Lease. Amerada counters that the words "leaseholds and/or lands covered by this Agreement" includes its right to substitute new gas leases for the SP 89 Lease since this right is part of the Agreement.

Amerada's interpretation is untenable. Each provision in a contract must be interpreted in light of other provisions giving each provision a meaning suggested by the contract as a whole and avoiding any interpretation that neutralizes or ignores any provision or treats it as surplusage. See La. Civ. Code Ann. art. 2050 (West 1987); Lambert, 418 So. 2d at 559-60. Amerada's interpretation wholly negates the Quantity of Gas provision in Article IV, paragraph 8 and renders it empty and meaningless.

In addition, Article II, Paragraph 1 in the original 1982 contract, and as amended in 1991, carefully identifies the gas areas dedicated to the contract with technically precise depth limitations. This provision would be reduced to surplusage if Amerada could substitute new gas sources at will.

15

Furthermore, in 1992 Amerada and TX Eastern amended the contract to release TX Eastern from the obligation to purchase gas from the Northern Area of SP 89 in return for a $19.3 million payment by TX Eastern. Under Amerada's interpretation, it could conceivably substitute gas from the Northern Area of SP 89 and thus reduce the entire 1992 amendment to a nullity.

In sum, without reaching beyond the four corners of the SP 89 contract and its amendments, we are convinced that the gas substitution clause, when read together with other provisions in the contract, permits Amerada Hess to substitute some portion of or all of the gas from the SP 89 Lease with similar quantities of other gas from another lease, provided other conditions stated in the gas substitution clause are satisfied. Since we find the contract as a whole to be unambiguous and susceptible to only one reasonable interpretation, Rutgers, 974 F.2d at 661-63, we do not address Amerada's argument that the district court improperly relied on extrinsic evidence to interpret the contract.

Benefitted by the excellent argument from all counsel, we are finally persuaded that we must AFFIRM the district court's grant of summary judgment in favor of Texas Eastern Transmission Corporation.