IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 98-10498
_____

SUN OPERATING LIMITED PARTNERSHIP,

Plaintiff-Appellant,

versus

MURPHY OIL CORP., ET AL.,

Defendants,

MURPHY EXPLORATION & PRODUCTION COMPANY,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Texas
(3:95-CV-4-J)
_____

June 1, 1999

Before REAVLEY, POLITZ and SMITH, Circuit Judges.

REAVLEY, Circuit Judge:[*]

Sun Oil Co. (Sun) sued Murphy Oil Co. (Murphy) for repayment of money advanced to Murphy by their agreement. The district court construed the terms of that agreement to require repayment by Murphy upon an event that has not yet occurred. We affirm.

**Background**

Sun is the operator of a group of gas producing blocks offshore Texas in the Gulf of Mexico. Murphy is one of the working interest owners. Under their operating agreement

   *. Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

Murphy may take its proportionate share of gas production and, if it fails to do so, Sun may sell it. After the parties determined that Sun's pipeline purchaser had taken a significant amount of production beyond Sun's proportionate share and gas for which Murphy should be paid, they executed two identical letter agreements. It is the effect of these letter agreements that they now dispute.

By the letter agreements Sun and Murphy agreed that Sun would pay a cash advance for the amount of the imbalance prior to September 1, 1981, and that Murphy would take gas in kind from future production to make up that advance. Furthermore, any part of Sun's cash advance that Murphy took in kind would not be repaid to Sun until the time within thirty days of termination of their gas balancing agreements (GBAs) or "termination of the various vintages described therein."

The "vintage" of natural gas may refer to the period during which the gas well was bottomed or produced, the depth of the well, the date on which the gas sales contract was made, or the regulatory category provided for in the National Gas Policy Act of 1978 (NGPA).[1] All of the working interest owners here executed GBAs covering the blocks subject to their operating agreements. The letter agreements between Sun and Murphy refer to the GBAs for their definition of "various vintages." The GBAs define the vintages only by reference to the definitions of gas categories provided for in the NGPA. The second of the GBAs' recital paragraphs states "the word 'vintage' is used in this Agreement to refer to each separate category provided for by the Natural Gas Policy Act of 1978 or other applicable statute which establishes

---

1. *See, e.g.*, *Shell Oil Co. v. Federal Power Comm'n*, 491 F.2d 82, 84 & n.5 (5th Cir. 1974); HOWARD R. WILLIAMS & CHARLES J. MEYERS, MANUAL OF OIL AND GAS TERMS 634 (4th ed. 1976). Similarly, Murphy notes in its briefing that:

> [t]he natural gas industry used the term "vintage" prior to the passage of the 1978 Act. Originally, natural gas was price controlled according to the year the well was drilled . . . . When the NGPA specified certain categories of gas to be regulated and deregulated, the industry used the term "vintage" for each of these classifications. Significantly, there were categories of gas that were not regulated by the NGPA that were also referred to as certain "vintages." For example, gas below 15,000 feet was not regulated by the NGPA but it was referred to as a "vintage" for purposes of the GBAs.

The NGPA categories of gas were codified at 15 U.S.C. §§ 3301, 3311-3320 (1978) (repealed 1989).

categories . . . ." The same paragraph provides a clause that becomes effective if the statutory sources for the vintage categories are deregulated. It stipulates that, "upon deregulation of any category, such deregulated gas shall be deemed to be a new category of gas production for purposes of this Agreement."

Paragraph six of the GBAs determines when and how cash balancing will occur under the GBAs. It provides that cash balancing will be made available "at the termination of gas production of a given vintage classification from the Blocks." Finally, the GBAs contain paragraph eight, which states that "[t]he parties hereto agree that all gas which has been delivered prior to the date of signing of the Gas Balancing Agreement has been properly delivered pursuant to the provisions hereof." Thus, the GBAs are given retroactive effect over gas imbalances arising since production began under the OAs.

Two vintages of gas are produced under these leases, 102(d) gas and 104 gas, the names corresponding to those sections of the NGPA. Section 102(d) instituted price controls on natural gas produced from an Outer Continental Shelf reservoir depending on when the reservoir was discovered or evidenced the capability of commercial production.[2] Section 104 controlled pricing of certain natural gas committed or dedicated to interstate commerce before enactment of the NGPA.[3] Vintage 102(d) sold at a higher price than vintage 104. The NGPA has since been repealed by the Natural Gas Wellhead Decontrol Act of 1989 (NGWDA),[4] which permanently eliminated wellhead price controls.[5] Although the definitions for the categories of gas vintages in the GBAs are taken from the NGPA, the word "vintage" is never used in the NGPA.

Since deregulation, Sun has designated production of the deregulated vintages in its balance sheets by the same numbers, but added the letters "DC," signifying "decontrolled."

---

2. *See* NGPA § 102(d), 15 U.S.C. § 3312(d) (repealed 1989).

3. *See* NGPA § 104(a), 15 U.S.C. § 3314(a) (repealed 1989).

4. Pub. L. No. 101-60, 103 Stat. 157 (1989).

5. *See id.* § 2(b).

Further, Sun has netted all categories of the vintaged gas—that is, pre- and post-deregulation 102(d) and 104 gas—for purposes of determining the system-wide balances of the parties.

Our question is whether, in the letter agreements, "termination of the various vintages described [in the GBAs]" refers to the cessation of actual production of a particular vintage of natural gas as defined by now extinguished federal regulations, or whether "termination" includes the nominal extinguishment of a gas vintage caused by deregulation of the working definition for that vintage.

The district court decided that "termination of various vintages" referred to cessation of production of a particular vintage of gas caused by depletion, not deregulation. We agree.[6]

## Analysis

Texas law governs our interpretation of the agreement.[7] We review the district court's construction of an unambiguous contract *de novo*.[8] When determining the legal effect of the parties' agreement, we construe the contract terms by their ordinary meanings.[9] The objective intent of the parties must be given effect as manifested by the writing.[10] If the legal meaning of the contract language is not readily apparent on its face, we may look to the surrounding circumstances, including usage between the parties and in the industry, to determine the intent of the parties.[11]

Neither party's construction is discordant with the ordinary meaning of "termination." The letter agreements use the word "termination" three times in the same paragraph, twice as to

---

6. In their argument the parties suggest a difference of opinion on the amount of the present balance of the advance. That issue, if any exists, has not been presented and is not decided by this case.

7. *See* 43 U.S.C. § 1333(a)(2)(A).

8. *See Texas E. Transmission Corp. v. Amerada Hess Corp.*, 145 F.3d 737, 741 (5th Cir. 1998) (citation omitted).

9. *See General Am. Indem. Co. v. Pepper*, 339 S.W.2d 660, 662 (Tex. 1960).

10. *See Watkins v. Petro-Search, Inc.*, 689 F.2d 537, 538 (5th Cir. 1982).

11. *See id.*; *Sun Oil Co. (Del.) v. Madeley*, 626 S.W.2d 726, 731 (Tex. 1981); *America's Favorite Chicken Co. v. Samaras*, 929 S.W.2d 617, 622-23 (Tex. App.—San Anotonio 1996, writ denied).

the termination of the GBA and once as to termination of vintages as described in the GBA. The only use to which Sun attributes the deregulation construction is the use that modifies "various vintages." The ordinary understanding of the word "termination" is that it indicates an "end in time or existence" or a "conclusion."[12] Deregulation at least nominally ends "in time or existence" or concludes the vintages, just as does cessation of physical production.

Upon considering the entire transaction we believe that the district court's reading is the better one. The meaning of "termination of various vintages" is described in the letter agreements specifically by reference to the GBAs, but the letter agreements do not indicate which section of the GBAs controls the meaning. Two paragraphs of the GBAs are relevant: paragraph six sets forth the cash balancing provisions, and the second recital provides a statutory source for the definition of "vintage," as well as a deregulatory clause that qualifies that meaning. We will consider each particular provision in turn and attempt to construe "termination" in the manner that least contradicts any of them or the parties' whole transaction.[13]

Paragraph six of the GBAs deals with the repayment of gas imbalances. An underproduced owner must be allowed to take make-up gas of a given vintage in an attempt to balance in kind. Only when in-kind balancing is no longer available does paragraph six provide a method for balancing in cash. The section is introduced with the following clause: "If at the termination of gas production of a given vintage classification from the Blocks an imbalance exists, such imbalance shall be accounted for as follows . . . ." As such, the GBAs maximize the ability of an underproduced party to balance in kind until cessation of production makes that impossible. This preference encourages full production of the reservoir.

Sun argues that paragraph six is materially distinguishable because the letter agreements concern repayment of an advance, which need not await depletion. Sun agrees that depletion of

---

12. WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 1217 (1985).

13. *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 134 (Tex. 1994) ("[N]o one phrase, sentence, or section . . . should be isolated from its setting and considered apart from the other provisions." (citation omitted)).

the gas reservoir may be an appropriate time to balance in cash, given the purposes of the GBAs: namely, a preference for balancing gas in kind to promote full production. Significantly, in-kind balancing is also preferred under the letter agreements. The letter agreements state that "[t]his payment by Sun to such underproduced owners heretofore enumerated is made under the condition that should said parties be able to make up all or any part of said gas which is the subject of this advance payment, that adjustments will be made as provided for in said [GBAs] covering said Blocks." Given that Murphy is able to first balance by taking make-up gas under both instruments, it is not unreasonable to rely on the cash balancing language from paragraph six of the GBAs when interpreting the letter agreements' repayment provision. Cessation of the vintages' physical production marks a reasonable point in both cases to conclude in-kind balancing and precipitate cash balancing of that vintage. On the other hand, Sun does not offer any rationale for using deregulation as the triggering event, other than that it is "an equally logical point." Thus, the same events activating cash balancing in the GBAs should trigger repayment of Sun's advance to Murphy, unless the parties clearly provided otherwise in the letter agreements. This they failed to do.

Sun argues that the second recital paragraph of the GBAs, which defines "vintage," controls the meaning of "termination" in the letter agreements and supersedes the interpretation drawn from paragraph six of the GBAs. The second recital explains that "vintage" refers to "each separate category provided for" in the NGPA or "other applicable statute which establishes categories." The definition relies on a regulatory source, so the paragraph next provides that, "upon deregulation of any category, such deregulated gas shall be deemed to be a new category of gas production for purposes of this Agreement." Because the GBAs deem 102(d) and 104 vintage gas to be a "new category" of gas production upon deregulation, Sun contends that the "various vintages" by definition "terminate" at the time of deregulation.

We are not persuaded that the clause terminates the deregulated vintages so much as it changes the operative nomenclature and saves the statutory categories' production for purposes

6

of preserving the duration of the GBAs, while perhaps triggering different pricing mechanisms. This alone is not sufficient to precipitate repayment under the letter agreements without a clear statement in the letter agreements that the parties intended to give it that effect. If Sun actually had intended the letter agreements to provide for cash repayment upon deregulation, the language used in the letter agreements and the GBAs did not make that intention objectively apparent, and Murphy cannot be bound by that unstated intent.[14] We find Sun's focus on the loose language in the second recital of the GBAs unavailing, given the similarity of purpose between paragraph six of the GBAs and the disputed portion of the letter agreements and the absence of any rationale favoring the "deregulation" construction.

In reaching our decision we also consider other uses by these parties and the industry custom. The word "termination" is used often in the agreements between Sun and Murphy, but universally it is used to signify "cessation of production." As we mentioned already, it is used twice in the same paragraph of the letter agreements, and both uses clearly signify termination caused by cessation of production. Further, it is the well-known standard in the oil and gas industry that "termination" usually occurs upon cessation of production in paying quantities.[15]

Finally, there is support available in the record that Sun's offer of a cash advance payment entailed repayment upon cessation of production. In a letter to all interest owners, Sun stated:

> A number of producer owners in the blocks, who would have an under-produced status, have indicated a desire to make periodic cash settlements for the blocks. While we are not prepared to make periodic cash settlements, Sun would nevertheless be willing, for those parties who are currently in an underproduced status, to make a one-time cash advance payment as an offset to the contemplated cash accounting which will result under the Gas Balancing Agreement upon termination of production for a given "vintage" of

---

14. *See, e.g.*, *City of Pinehurst v. Spooner Addition Water Co.*, 432 S.W.2d 515, 518 (Tex. 1968).

15. *See, e.g.*, WILLIAMS & MYERS, *supra*, at 597 ("A lease may be terminated by a lessee by the exercise of a surrender clause in the lease, and under contemporary forms of leases, failure of production in paying quantities at or after expiration of the primary term will cause the lease to be terminated unless it can be preserved by some savings clause in the lease . . . .").

gas.[16]

This language does not suggest that deregulation triggers repayment.  Rather, it appears that the cash repayment provision would be triggered in the same way as the cash balancing provisions of the GBAs, by cessation of production.  At least one other interest owner considering the proposed cash advance also understood repayment of the advance to be due upon cessation of production.  In a letter from Ensearch Exploration, Inc. to Sun and the other interest owners, including Murphy, it explained the cash advance in these terms:

> Sun has proposed that the party owners enter into an economic gas balancing agreement for each of the sets of blocks, which would provide for a monetary settlement between the over- and under-produced parties upon termination of the production of a given vintage of gas.  Sun has also suggested that it is willing to make, for those parties presently in an underproduced status, a one-time cash advance payment for the period beginning with the first production, through April 1981.  Such payment would be an offset to the contemplated cash accounting under the terms of the proposed gas balancing agreement upon the termination of production from a given vintage of gas.[17]

This letter was dated August 13, 1981, within the period of formation of the letter agreements, and was circulated to both parties to this dispute.  These records are additional aids to our interpretation of the letter agreements and the objective intent of Sun and Murphy because they situate those documents in the light of the circumstances of the parties' negotiations.[18]

"The circumstances help to illuminate the contractual language chosen by the parties and enable evaluation of 'the objects and purposes intended to be accomplished by them in entering into the contract.'"[19]  Adhering to the understanding of "termination" as "cessation of production" best reflects the purpose of the entire transaction between Sun and Murphy, given the absence of

16.  Letter from E.S. Iiams, Jr., Manager, Gas Sales, Sun Oil Co., to the joint interest owners (June 19, 1981).

17.  Letter from R.F.Crawford, Manager, Contract Administration, Ensearch Exploration, Inc., to E.S. Iiams, Jr, Manager, Gas Sales, Sun Gas Co. (Aug. 13, 1981).

18.  *See, e.g.*, *Balandran v. Safeco Ins. Co. of Am.*, 972 S.W.2d 738, 741 (Tex. 1998).

19.  *National Union Fire Ins. Co. v. Insurance Co. of N. Am.*, 955 S.W.2d 120, 127-28 (Tex. App.—Houston [14th Dist.] 1997, pet. filed) (quoting *Medical Towers, Ltd. v. St. Luke's Episcopal Hosp.*, 750 S.W.2d 820, 823 (Tex. App.—Houston [14th Dist.] 1988, writ denied)).

any objectively apparent intent to the contrary.

Sun argues that this construction would render the alternatives provided for in the letter agreements duplicative, which violates our obligation to construe the whole agreement without nullifying or rendering ineffective any provision.[20] The letter agreements state that repayment becomes due (1) upon termination of the GBAs *or* (2) termination of the various vintages. The GBAs terminate when the operating agreements terminate. The operating agreements terminate when the leases covered by the operating agreements terminate. And the underlying leases terminate upon cessation of production in paying quantities. Thus, according to Sun, the first alternative means the same thing as our understanding of the second alternative. We disagree. The leases, operating agreements, and GBAs will remain in effect so long as production in paying quantities continues on the lease property, even if production of a given vintage ceases. AFFIRMED.

---

20. *See, e.g.*, *Memorial Med. Ctr. v. Keszler*, 943 S.W.2d 433, 434 (Tex. 1997).