DUHÉ, Circuit Judge,
joined by WIENER, DeMOSS, STEWART, and PARKER, Circuit Judges, dissenting:
I am firmly convinced that the majority errs when it adopts the fiction that, as a matter of law, each separate use of a pre-approved credit card constitutes a representation by the user of an intent to pay, and that, if it does, the credit card issuer may rely on those representations. I, therefore, respectfully dissent for the reasons set forth in the panel opinion, AT&T v. Mercer (In re Mercer), 211 F.3d 214 (5th Cir.2000), and the following reasons. Mindful that dissents do little more than make the dissenter feel better, I shall state my reasons briefly.
The majority admits that a creditor must prove every element of its claim of nondischargeability by a preponderance of the evidence. But the majority has completely ignored the universally accepted and fundamental principle of bankruptcy law that exceptions to discharge must be narrowly construed in favor of the debtor. See, for example, Miller v. J.D. Abrams *426 Inc. (In re Miller), 156 F.3d 598, 602 (5th Cir.1998). The majority’s omission effectively shifts the burden of proof and alters “ ‘the balance of bankruptcy policy struck by section 523’ ”. Chevy Chase Bank, FSB v. Briese (In re Briese), 196 B.R. 440, 448 (Bankr.W.D.Wis.1996) (quoting Chase Manhattan Bank, N.A. v. Ford (In re Ford), 186 B.R. 312, 317 (Bankr.N.D.Ga.1995)) (“To permit credit card plaintiffs to benefit from ‘implications’ is to engage in impermissible burden-shifting.”) Briese, 196 B.R. at 449. If one can “infer” a representation from use of the card, then the creditor is relieved of the obligation of proving that a false representation was made.
The majority also ignores a second universally accepted canon of construction: contracts should be construed so as to avoid neutralizing or ignoring any provisions or treating provisions as surplusage. See, for example, Texas E. Transmission Corp. v. Amerada Hess Corp., 145 F.3d 737, 742 (5th Cir.1998). The majority construes Mercer’s credit agreement so as to neutralize completely its provisions obligating Mercer to repay AT&T for debts accumulated on the card.[1] Mercer represented in writing in the credit agreement, which she was required to accept before she used the card, that she intended to repay AT&T for credit extended through the card. The credit agreement embodied the entire agreement between Mercer and AT&T. Whjr, then, would Mercer undertake to represent each time she used her card that she intended to repay AT&T for its use? Though otherwise impressively thorough, the majority opinion does not answer this question. Indeed, the question cannot be answered because Mercer made no such representations. The majority’s less-than-benign fiction that she did has an unfortunate consequence: it allows AT&T effectively to rewrite the credit agreement after the fact. This is hardly the “narrow construction” the law requires. As rewritten through the majority’s legerdemain, moreover, the agreement between Mercer and AT&T clearly favors AT&T, since all agree that Mercer’s violation of the credit agreement’s requirement that she repay AT&T does not preclude discharge of her debt.
In my view, use of a credit card resembles the issuance of a check. The Supreme Court has held, as the majority admits, that issuing a check in payment of a debt knowing that the account on which the check is drawn does not contain sufficient funds to cover the check is not a representation that there are funds sufficient to cover the check. It is in fact not a representation of anything. Williams v. United States, 458 U.S. 279, 284, 102 S.Ct. 3088, 3091, 73 L.Ed.2d 767 (1982) (“[T]eeh-nically speaking, a check is not a factual assertion at all, and therefore cannot be characterized as ‘true’ or ‘false’ ”). In Williams, the defendant engaged in a check kiting scheme during which he presented to several federally insured banks checks on his accounts that greatly exceeded the funds in those accounts. The Court held that by so doing, the defendant did not “make a false statement” because issuing the check was no statement at all. Id. The majority also discounts this holding because Williams was a criminal case and because a check simply orders funds to be transferred, but I fail to see how these facts impact Williams’s holding that issuing the check is not a representation. The majority also discounts Williams on the basis that in it the Court was applying the rule of lenity. A simple reading of the opinion shows, however, that the rule of lenity did not affect the rationale for the *427 holding, which the Court announced early in the opinion after thorough analysis. The Court in Williams only mentioned the rule of lenity in passing at the very end of the opinion after fully establishing the holding. If giving a check in payment of a debt is not a representation, then there is no justification in my view for holding, as the majority does, that using a credit card to obtain cash or make purchases is. This is particularly true in this case, where there was prior written representation of intent to repay. When a check is presented in payment of goods or services, or in exchange for cash, it simply authorizes the transfer of funds from the drawer’s account to the merchant. Likewise, when a credit card is presented for the same purposes, it simply authorizes a transfer of funds from the card-holder’s approved line of credit to the merchant, or to the cardholder in the case of the use of an ATM machine. Williams, therefore, applies here.
Interestingly, most of the courts that have adopted the implied representation theory have not considered Williams. AT&T Universal Card Servs. v. Alvi (In re Alvi), 191 B.R. 724, 732 (Bankr.N.D.Ill. 1996). The similarities between the issuance of a check and the use of a credit card make it illogical, I submit, to conclude that the use of a credit card in an ordinary credit transaction necessarily invokes a representation, when the issuance of a check does not.
The majority incorrectly characterizes the relationship between AT&T and Mercer as a series of loans — i.e., a loan made each time the card was used. The majority, accordingly, concludes that “[h]er promise to pay occurred not when the line was established, but at card-use, when the loan was made.” Opinion p. 406. This conclusion is simply incorrect. Her promise to pay occurred when Mercer accepted the written credit agreement with AT&T, which states that the card holder is “responsible for all amounts owed on [the card holder’s] [a]ceount ... and [the card holder] agree[s] to pay such amounts according to the terms of the [a]greement.” AT&T conditioned its offer of credit to Mercer on her promise to accept the credit agreement and furnish certain information (annual income, social security number, birth date, home and business telephone numbers and her maiden name), which promise she kept. As I noted above, AT&T agreed with Mercer at that time upon all terms and conditions that would inform her use of the card. So what occurred when she used the card, therefore, was simply the transfer of funds against the credit line previously established and on the terms and conditions previously established. No new loan agreement was made and no new terms were agreed to. Hence, no new representations were made.
Although the panel opinion noted as much, this case implicates policy issues that, I think, merit another brief reference. AT&T offered Mercer a credit card and a $3,000 credit limit after conducting the cursory credit check described in the majority opinion on the condition that she return certain information, which she did, and that she accept the credit agreement, which she did. She was then free to use the card, subject to the terms and conditions of the agreement. Never did AT&T inquire about her prior credit card use, or the amount of her debt. Had it done so, Mercer’s lack of creditworthiness would have been obvious. Now AT&T asks this Court to fashion a fiction to save it from the consequences of its own inadequate credit check, and, to my surprise, this Court has done so. This action, in my view, subverts the requirement that the creditor prove each element of the exception to discharge upon which it relies and the bedrock principle that exceptions to *428 discharge must be narrowly construed in favor of the debtor.
Since I would hold that no implied representation was made, I would not reach the reliance issue.
DENNIS, Circuit Judge,
dissenting:
Although I find Judge Duhé’s dissenting opinion quite persuasive and am tempted to rest upon it, I dissent separately because I believe that this court should affirm the bankruptcy and district court judgments on the well-settled ground that there is no evidence in the record that AT&T took action in actual reliance upon each of Mercer’s individual credit or cash draws on her line of credit. While I am uncertain about the analogy Judge Duhé draws between bank checks and credit card transactions, I agree with the reasoning of his dissent insofar as it demonstrates that there was no evidence of actual reliance on individual card transactions as representations in this case.
The Bankruptcy Code excepts from discharge certain debts resulting from “false pretenses, a false representation, or actual fraud.” 11 U.S.C. § 523(a)(2)(A). In interpreting this provision the Supreme Court has looked to the concept of “actual fraud” as it was understood in 1978 when that language was added to § 523(a)(2)(A). Field v. Mans, 516 U.S. 59, 70, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995). For aid to that understanding the Court has relied on the Restatement (Second) of Torts (1976) published shortly before the Bankruptcy Reform Act of 1978. Id. “The section on point dealing with fraudulent misrepresentation states that both actual and justifiable reliance are required.” Id. (internal quotation omitted) (citing RestatemeNt (Second) of Torts § 537).
Section 537 of the Restatement (Second) of Torts provides: “The recipient of a fraudulent misrepresentation can recover against its maker for pecuniary loss resulting from it if, but only if, (a) he relies on the misrepresentation in acting or refraining from action, and (b) his reliance is justifiable.” See also id. cmt. a (“If the recipient does not in fact rely on the misrepresentation, the fact that he takes some action that would be consistent with his reliance on it and as a result suffers pecuniary loss, does not impose any liability upon the maker.”). Consequently, to deny Mercer a discharge of her credit card debt, AT&T was required to prove by a preponderance of the evidence that, inter alia, AT&T sustained a pecuniary loss from fraudulent misrepresentations by Mercer upon which AT&T in fact relied in taking action or refraining from action. Proof by AT&T that it took some action that would be consistent with its reliance on an alleged misrepresentation, without proof of its actual reliance on the alleged misrepresentation, is not sufficient.
Because AT&T did not introduce any evidence to show that it actually relied on any of Mercer’s alleged misrepresentations in taking or refraining from action, the bankruptcy court correctly refused to deny Mercer’s discharge.[1] The arguments by AT&T, adopted by the majority, that AT&T took action in actual reliance on alleged misrepresentations implied by each of Mercer’s individual draws on her line of credit are empty assertions. The record simply does not support a factual finding *429 of any such reliance or action. The majority opinion wrongly reverses the decision of the bankruptcy court, which held that AT&T failed to prove that it actually relied on Ms. Mercer’s individual credit purchases and ATM withdrawals in extending credit to her, because there is absolutely no evidence in the record that AT&T contemporaneously relied on the individual transactions in its decision to extend or to continue a three-thousand-dollar line of credit to her. The record evidence shows that AT&T relied solely on its own screening process and automated system in allowing Ms. Mercer to make cash and credit draws on her line of credit.
The majority opinion is badly mistaken in asserting that the testimony of AT&T’s expert, Mr. Lewis, shows that AT&T relied on a supposed representation made during each use of Mercer’s card in authorizing her to draw on the credit line. Maj. Op. at 409. When read in context, his statement — to the effect that if AT&T had known Mercer would not pay the credit card charges, it would not have extended credit to her in the first place — was not made in reference to reliance upon Mercer’s card use. It clearly concerned the quality of the information AT&T had at the time it decided to issue a pre-approved card and extend a line of credit to Mercer, which of course occurred before she ever used her card. Mr. Lewis made the statement after AT&T’s counsel reviewed with him the six credit cards that Mercer obtained prior to receiving her AT&T card and the fact that Mercer had been screened three times by a credit bureau before her AT&T card was activated:
Q. Based on AT&T’s records with regard to this information, would AT&T have extended credit to this defendant if it knew that she would not pay or did not have ability to pay for these charges on this account?
A. I would say no.
Q. Had any of those reports come back with negative information concerning delinquent payments, over limits, bankruptcy, that type of information, would she have been sent a solicitation offer?
A. No.
ROA, Vol. 5, pp. 123-124 (emphasis added). The question put to Mr. Lewis clearly refers to the point in time when AT&T determined the credit limit it would offer to Ms. Mercer and accordingly “extended credit” to her by issuing a credit card in her name with that limit.[2] This line of questioning — discussing the effort AT&T expended by procuring credit reports before the credit card was issued' — was meant, in the words of AT&T’s counsel, “to dispel any notion that may exist that credit card companies in general go through the phone book and pull out a mailing list and send out applications or offers to people without regard to their creditworthiness.” Closing arguments of AT&T’s counsel, ROA, p. 105. In sum, Mr. Lewis never testified that AT&T relied in acting or refraining from action on the individual credit purchases and ATM withdrawals made by Ms. Mercer.
AT&T’s decision and action in extending a three-thousand-dollar line of credit to Mercer was made in reliance upon AT&T’s own research before she accepted AT&T’s offer of credit. AT&T v. Mercer, 220 B.R. 315, 326-327 (Bankr.S.D.Miss.1998). As Mr. Lewis testified before the bankruptcy judge:
[Wjhen we issue a solicitation or subsequently issue a card, it’s based on — and again, some people may agree that it’s not long enough, but it’s based on at *430 least a six or seven month study of that person’s credit history and their ability to maintain their accounts....
[Pre-approved credit card holders] have been eligible for a line [of credit] determined on their prior usage and history as stated [by] the [credit] bureau.
ROA, Vol. 5, p. 140-141. Later Mercer’s counsel again stressed and Mr. Lewis agreed that the decision to act by extending a line of credit to Mercer was made in reliance upon AT&T’s own research before it activated her credit card:
Q. So based on all these different reviews, analyses that’s done and everything else, y’all determined that Ms. Mercer has the financial ability to handle a $3,000 unsecured credit line with your company, right?
A. Based on the information we had at the time, yes, sir.
ROA, Vol. 5, p. 159.
After Mercer accepted the credit card and began using it, AT&T did not take any action to extend her line of credit in contemporaneous reliance on each draw. Instead of looking at each transaction made by an individual like Mercer, AT&T set up its automated system to make quarterly credit evaluations of its customers, the results of which, along with information the company maintained about the promptness of payments, whether each customer stayed within his/her credit limit, and whether excessive use of a particular card was made within a period of time, formed the basis of AT&T’s decisions regarding whether to terminate or continue cardholders’ credit lines.[3] Each cash advance Mercer obtained was made instantaneously from an ATM machine; no one at AT&T evaluated the transaction or relied on any implicit representation made by Mercer while using her card.
The testimony of AT&T’s expert, Mr. Lewis, explaining how Mercer was allowed to make charges surpassing her credit limit without being cut off first by AT&T, proves that AT&T does not monitor each individual transaction while it is being made, therefore negating a finding that AT&T actually relies on any representation made during a specific transaction.
Q. Can you explain why [Mercer’s final account balance] exceeds the [maximum] balance allowed on this account of $3,000?
A.... The reason that there is an over limit charge on the account is that if you’ll refer to page 1 and 2 of our statement you will see that the transaction dates reflect the date that the charge was made. If you will refer to the posting date when we receive the charges from the merchants, in some cases there will be delays of three days, five days, two days; so although the charge has been made, if it is a floor limit charge it does not have to be called in or authorized by us to post to the account. There is going to be a gap where all the charges[,] because we have not received them from that merchant!,] are posted to the customer’s account, which would *431 enable the account to have new charge activity which could put it over the limit.
ROA Vol. 5, pp. 77-78. Mr. Lewis went on to explain that, even if a merchant requires authorization, for a charge, such authorization does not involve reliance upon any representation that may be made by the cardholder at the time the card is used; instead: “[A]n authorization is basically an approval saying that at the time this charge was made there is sufficient credit available on the customer’s credit line to let the charge be made.” Id. at 78. Furthermore, as the majority opinion points out, AT&T was not aware that on several occasions
when [Mercer] inserted her card into the ATM, she was in a casino. Instead, the billing statement reflects that, although Mercer obtained four advances at a casino on 23 and 24 November, they were not posted until 27 November. As [AT&T’s] representative testified, that posting-date is when [AT&T] receives ah electronic transfer notification from the clearing bank, which may be several days after the transaction.
Maj. Op. at 420-21 (emphasis omitted). Because AT&T was not aware of each transaction until several days after it occurred, AT&T could not have relied upon each individual draw on Mercer’s credit line contemporaneously with its occurrence. Nor does the record contain any evidence to support findings that AT&T in fact engaged in action in reliance on each charge as it occurred.
Another telling line of questioning from AT&T’s own counsel in the hearing before the bankruptcy court focuses on Mr. Lewis’s assertions that Mercer’s uses of the card indicated her intent not to repay the charges she was incurring:
Q. At the time that the debtor was using the card, having reviewed her duplicate account statements, what facts do you see in ... her use of the card ... that would lead you to believe that she lacked the requisite intent to repay this debt?
A. At the time of her usage of the card?
Q. Yes, sir.
A. [T]he fact of the location where the cash advances were taken, namely casinos ....
Q. So to further elaborate on some other items that might have been concerns to AT&T — was the number of charges made a concern?[4]
A. The number of charges in that one period of time, yes.
Q. The amount of the charges?
A. The amount of the charges, particularly since it took the account over the limit, yes.
Q. Would the fact that the debtor had made numerous transactions on the same day become a concern?
A. That would have been addressed in ... [AT&T’s internal report], where that came in as a possible alert.
ROA, Vol. 5, pp. 127-131. It is highly improbable that AT&T actually relied on these same card uses — which its expert testified were indicative of a fraudulent intent not to repay the charges incurred— in deciding to take the action of extending credit to Mercer.
That AT&T utterly failed to prove actual reliance upon anything while the charges were being made was unmistakably the factual finding of the bankruptcy judge after hearing the evidence:
*432 The evidence showed that prior to and subsequent to the issuance of the AT&T credit card to Mercer, several investigations and evaluations of Mercer’s creditworthiness were conducted by AT&T.... AT&T solely relied on its own agents and investigative processes to make its decision. The evidence reflects nothing written, said or done by Mercer upon which AT&T relied at any time while the charges were being made.
220 B.R. 315, 326-327 (emphasis added). Because this finding of fact was not clearly erroneous, the majority is manifestly wrong in setting it aside. “Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses.” Federal Rule of Civil Procedure 52(a). Because AT&T did not prove that it actually relied on a misrepresentation by Mercer in acting to extend or continue her line of credit, its suit to deny her discharge was correctly rejected and dismissed by the bankruptcy court. The fact that the bankruptcy court may have miss spoken or incorrectly stated a rule of law that did not affect substantial justice or the substantial rights of the parties must be disregarded. “[Njo error or defect in any ruling by the court ... is ground for ... disturbing a judgment ... unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.” Federal Rule of Civil Procedure 61.
The district court, therefore, was clearly correct in affirming the bankruptcy court’s decision because there was no clear error in the bankruptcy judge’s finding that AT&T failed to prove that it actually relied on any representations made by Mercer:
[TJhis Court finds that the lower court did not commit clear error in finding that “ the evidence reflects nothing written, said or done by Mercer upon which AT&T relied at any time while the charges were being made” and that AT&T “solely relied on its own agents and investigative processes to make its decision” to issue the credit card. Without the requisite proof showing actual ... reliance, the appellant’s claim for nondischargeability does not meet the requirements for the false pretense or actual fraud prongs of 11 U.S.C. § 523(a)(2)(A).
Mem. Op. p. 9.
Consequently, the majority is doubly wrong in reversing the judgments of the bankruptcy and district courts. Furthermore, even if we were not legally bound to uphold, in the absence of clear error, the trial court’s crucial finding of fact that AT&T did not actually rely on a misrepresentation by Mercer in taking action to extend or continue her line of credit, a thorough, objective review of the record shows that AT&T did not prove this element of its case. Therefore, because AT&T failed to prove the essential element of actual reliance this court should affirm the bankruptcy and district courts without reaching the issues of representation and justifiable reliance.

. In other words, to ignore the essence of the credit agreement.

. There is no evidence that AT&T relied on an alleged misrepresentation in either "acting” or "refraining from action.” The majority's theory is that AT&T "acted” by extending credit to Mercer in actual reliance on each individual draw she made on her credit line. The majority’s theory is not that AT&T "refrained from action” in reliance upon misrepresentations. Therefore, for purposes of this dissent, I do not repeat "or refraining from action” at every point at which "act,” "action” or "acting” is mentioned.

. The majority opinion misinterprets the words "extended credit” in the question as referring to what happened when Ms. Mercer made cash draws on her line of credit.

. See closing arguments of AT&T's counsel before the bankruptcy judge, ROA pp. 106-107. In Mercer's case, AT&T had not yet performed a quarterly review of Mercer's credit when she exceeded her credit limit and was advised to discontinue using her card. A computerized program run for the purpose of monitoring excessive usage of cards within a short period of time had, however, "red flagged” Mercer’s account, and an AT&T associate evaluated her account activity as a result. However, he “cleared” her account for continued use because, in the words of Mr. Lewis, "[the charges] were not overly excessive to thousands of dollars or things of that nature.” ROA, Vol. 5, pp. 93-94. Again, however, ihese facts constituted evidence of AT&T's reliance on its own methodology and systems, not evidence of any reliance upon the card charges as implied representations.

. Lewis testified that Mercer used the card 32 or 36 times in a 30-day period. ROA, Vol. 5, p. 130.