GULOTTA, Judge.
In this construction contract case, plaintiff, a steel supplier, claims entitlement to $24,158.61, the amount of escalated costs of reinforcing steel, welded wire fabric and other steel materials furnished and delivered by plaintiff to defendant for the construction of a courthouse and jail facility in St. Charles Parish, in accordance with a contract entered into between the parties on April 19, 1974.
The trial judge in the judgment dismissing plaintiff’s suit stated that Ceco “... has failed to carry the burden of proof required . . .. ” Plaintiff appeals. We reverse.
In response to Mid-Gulf Construction, Inc.’s April 19, 1974 purchase order, Ceco Corporation agreed to deliver to Mid-Gulf certain steel materials in connection with the construction job at a cost of $194,883.52. The agreement provided that all materials would be shipped to arrive at the job by August 1, 1974. Conditions attached to the agreement and around which this dispute revolved, are as follows:
“All reinforcing steel prices listed herein are firm until August 12,1974, prices for materials shipped after that date will be increased a maximum of $25.00/ton for each 6-month period after August 12, 1974.
In the event that Ceco’s suppliers for Mesh and Rebar accessories increase their price to Ceco after February 12, 1974, material prices shall be increased by the actual amount of the increase.”
Also included in the purchase order is a recitation that:
“All materials will be delivered to the Job Site by the Seller’s Truck in the sequence and quantities required.”
Steel was first delivered on June 13 and 14, 1974, and then periodically as requested *476 by Mid-Gulf and required on the construction job. Invoices were sent to Mid-Gulf in connection with each delivery. On September 9, 1974, defendant was notified by the district manager of Ceco that in accordance with the terms of the contract the escalation clause had become effective and the remaining steel shipment would be increased by the sum of $25.00 per ton.
In accordance with that letter, a September 27, 1974 invoice reflected the escalation increase. This increase was also reflected in subsequent invoices dated October 22, 1974, November 12, 1974, December 4, 1974, February 24, 1975, two invoices dated February 25,1975, March 3,1975, May 28,1975, June 16, 1975, June 19, 1975, and June 27, 1975. These escalation costs as reflected in the invoices were paid without any protest from Mid-Gulf. However, the sum of $24,-158.61, the total amount of the accumulated escalation costs charged to Mid-Gulf and now the subject of this suit, was withheld by Mid-Gulf from final payment, to Ceco under the contract.
According to plaintiff, although the purchase order specified that all materials were to be shipped for arrival at the job by August 1, 1974, the delivery dates were modified by Mid-Gulf as is customary in construction contracts involving large shipments. Plaintiff claims that requests for delivery were made by the Mid-Gulf superintendent on the job as required for use in the construction. Supportive of this position was a letter dated December 4, 1974 and addressed to Mid-Gulf by Ceco which states that confirmation was being made of a telephone conversation with Mid-Gulf’s assistant job superintendent rescheduling reinforcing steel shipments as per the job superintendent’s request.
Plaintiff also contends that Mid-Gulf’s silence and inaction to the invoice escalation charges and indeed payment of the invoice amount including the specific escalation charges is an implied assent to the contract modification and assessment of those charges. Plaintiff relies in support of this contention on LSA-C.C. arts. 1811 and 1816.[1] We agree.
Robert Krejcu, Ceco’s district manager at the time the contract was entered into with defendant, testified that reinforcement steel is normally scheduled for shipment to the job site between the job superintendent of the construction contractor and Ceco’s chief draftsman who handles the details and scheduling. These shipments are usually scheduled when required in different phases of construction. When and where steel is delivered, according to Krejcu, are controlled by the general contractor’s general superintendent on the job, in this case, Mid-Gulf’s superintendent. Krejcu pointed out the first requested delivery by Mid-Gulf was on June 15, 1974 and the next request was made on August 30, 1974. The steel deliveries were made as requested by Mid-Gulf. Krejcu further supported Ceco’s claim that Mid-Gulf was notified after August 12, 1974 that the escalation clause in the contract was triggered by the later delivery and no exception was taken or *477 objection made to that communication. Krejcu also pointed out that the invoices including the escalation clauses were paid by Mid-Gulf without objection. The shipments were not made prior to August 1, or August 12, according to Krejcu because they had not been requested. Delivery could have been made at any time that delivery had been requested. As late as June 6,1975, Ceco was still ordering steel to be fabricated in Houston for use on the job.
Eric Berger, Ceco’s superintendent and chief draftsman on the job in 1974 who handled the scheduling of shipments of steel, stated that the steel deliveries were made when requested by Mid-Gulf’s job superintendent, Al Schreffner. This witness, to a large extent, corroborated Krejcu’s testimony. He additionally testified that he had no recollection of any request for a delay in delivery made by Mid-Gulf prior to August 12, 1974.
Thomas B. Sellers, the president of the sub-contractor responsible for placement of the delivered steel on the courthouse and jail facility, testified that other than the initial delivery at no time was there an insufficiency of steel on the job site, but rather “more than enough steel to do the work.” He emphasized that there was a plentiful supply of steel on hand. On occasions he indicated that steel was being delivered to the site in amounts more than could be used at the time. No delays, according to this witness, were caused in delivery by Ceco. Sellers at first testified that if all of the steel required in the entire construction had been delivered prior to August 1 it could have been stacked on the job site in such a way as to permit its use as required in the development of the construction job. He later stated, however, that there was not enough space on the job site to store all of the steel required in the entire job. This sub-contractor testified that he was on the job site just about every day of construction and that it was not customaiy in construction jobs such as this one that all steel would be delivered to the job site at one time.
J. Michael Dixon, the department manager for Mid-Gulf at the time the construction job was in progress, testified that he had participated only “peripherally” in the original purchase order between Mid-Gulf and Ceco in April, 1974. His predecessor at Mid-Gulf, Cory Pittman, had handled the job until December 15,1974 and it had been Pittman’s original responsibility for the scheduling of delivery of the materials to the job site. Dixon testified that he had commenced work on the job in November, 1974. Made aware in November of the escalation charges being made, Dixon instructed that those charges would not be paid. This witness referred to an undated letter from Mid-Gulf to Cimini-Meric Associates, Architects, which referred to the delivery of miscellaneous reinforcing steel. This transmittal stated that the delivery of those items would be required on the job by June 1, 1974. At the bottom of that letter designated “Remarks” is a recitation: “Please review at once as we must take delivery of all reinforcing steel by August 5, 1974 or price will increase by $25 per ton.” According to Dixon, this statement in the letter indicates an awareness on the part of Mid-Gulf of the effective date triggering the escalation clause.
Dixon admitted that prior to August, 1974, or December, 1974, neither he nor any other one to his knowledge at Mid-Gulf notified Ceco that they were not going to honor the escalation clause. He reasoned that if they had notified Ceco to this effect plaintiff would have refused to deliver the steel to the job site. Dixon stated that during that time neither he nor other Mid-Gulf employees responsible for the steel deliveries had ever asked Ceco to delay the delivery of any shipment of steel. Contradicting Sellers’ earlier testimony, Dixon stated that at the time the delivery of steel shipments were to have been made, i. e., prior to August 1, 1974, the job site could have accommodated and stored all of the steel included in the purchase order to be used on the construction job,
Arbry Bill Bass, the superintendent for Mid-Gulf Construction in 1974, reiterated that it was not normal or usual custom for *478 delays of delivery of materials to the job. One delay, according to his recollection, was made for delivery of steel in December. This delay was requested because other subcontractors had placed trailers and materials on the job site and there was a lack of available space to store the steel to be delivered. Bass testified that in August, 1974 the construction site was ready to accept and accommodate all of the steel ordered from Ceco.
From our consideration of the testimony, it is clear that although the purchase order specified that all materials were to be delivered to the job site by August 1, 1974, the contract was modified by requests for delivery as the steel was needed in the course of construction. The only contradictory testimony was that of Dixon. He admitted, however, that he was not involved in the consideration of the original purchase order in April 1974 nor subsequently thereafter, until November 1974, subsequent to the August 1, 1974 delivery date requirement. We find significant also, in the resolution of this dispute, that the purchase order contains a recitation that “All materials will be delivered to the Job Site by the Seller’s Truck in the sequence and quantities required.” This recitation is corroborative of the anticipated delivery in a sequence and in a quantity as required for use in the course of construction. This clause, to some extent, makes the delivery date requirement, August 1, 1974, less meaningful.
As pointed out by plaintiff, LSA-C.C. art. 1811, supra, states that a contract may be assented to expressly or impliedly. The assent may be implied when manifested by actions, or by silence or by inaction. See LSA-C.C. art. 1816, supra, and LSA-C.C. art. 1817.[2] Southern Scrap Mat Co. v. Commercial Scrap Mat. Corp., 239 La. 958, 120 So.2d 491 (1960); Bank of Louisiana in New Orleans v. Campbell, 329 So.2d 235 (La.App. 4th Cir. 1976), writ denied, 332 So.2d 866 (La.1976); W.R. Aldrich & Company v. Spalitta, 285 So.2d 835 (La.App. 1st Cir. 1973); Sam Parish Const. Co. v. Cities Service Pipeline Co., 254 So.2d 73 (La.App. 3rd Cir. 1971), writ refused, 260 La. 289, 255 So.2d 773 (1972); and, Alliance Manufacturing Company v. Foti, 146 So.2d 464 (La. App. 4th Cir. 1962), writ refused, 243 La. 1005, 149 So.2d 763 (1963).
We hold, under the circumstances, that the delivery date was modified from August 1, 1974 to such times as requested and required by Mid-Gulf and a modification of the original purchase order was made by the subsequent actions of Ceco and Mid-Gulf thereby permitting the later deliveries. We conclude also that Mid-Gulf’s failure to object to the invoice escalation charges constituted an acquiescence in those charges. If Mid-Gulf had objected to the initial invoice escalation charge, perhaps all deliveries could have been made to the job site at that time to obviate any additional escalation costs.
Our factual situation is very similar to that in Stupp Corp. v. Con-Plex, Div. of U. S. Ind., 344 So.2d 394 (La.App. 1st Cir. 1977). In the Stupp case, a steel products supplier set forth as a condition of the sale that prices would be subject to escalation. The purchaser, on the other hand, believed that the price was firm for the duration of the contract. The Stupp court held that although the initial contract between the parties was void since there was no agreement as to price, the parties had entered into a subsequent contract at a higher price when the purchaser accepted without protest steel delivered at an escalated price. After citing LSA-C.C. arts. 1811 and 1816, the Stupp court stated:
“An examination of the record discloses that in its Order Acknowledgment, Stupp clearly stated its rights to increase prices and Con-Plex was informed of Stupp’s *479 price increase before any shipments were made at the increased price. Thereafter, Con-Plex received, accepted and used seventeen shipments of pipe piling and end plates. Payments were made on fifteen of these shipments, without protest. Only after all shipments had been received by Con-Plex was there any objection to the price increase.
Therefore, we conclude that the trial court was correct in holding that Con-Plex entered into a subsequent contract at the higher price.”
We hold in our case that Ceco met its burden of proving a modification of the delivery date. Accordingly, the judgment dismissing plaintiff’s suit is reversed and set aside. Judgment is now rendered in favor of The Ceco Corporation and against Mid-Gulf Construction, Inc. and Great American Insurance Company, in solido, in the sum of $24,158.61 plus interest from date of judicial demand and costs.

REVERSED, SET ASIDE, AND RENDERED.

. LSA-C.C. arts. 1811 and 1816 read as follows:
“Art. 1811. The proposition as well as the assent to a contract may be express or implied: Express when evinced by words, either written or spoken;
Implied, when it is manifested by actions, even by silence or by inaction, in cases in which they can from circumstances be supposed to mean, or by legal presumption are directed to be considered as evidence of an assent.”
“Art. 1816. Actions without words, either written or spoken, are presumptive evidence of a contract, when they are done under circumstances that naturally imply a consent to such contract. To receive goods from a merchant without any express promise, and to use them, implies a contract to pay the value. If an offer is made of an article in deposit, and the article is received, the contract of deposit is complete. If a mandate is acted on, the mandatory is bound in the same manner as if he had accepted in writing. In all those cases and others of the like nature, all the conditions, which he, who gives or proposes, annexed to the delivery or the acceptance of the proposition, are also presumed to have been accepted by the act of receiving. If the merchant, in delivering the goods, declare that they must be paid for by a certain time; if the depositor designate how the deposit is to be kept, or the mandator in which manner his commission is to be executed, he who receives and acts is obligated to the performance of all these conditions.”

. LSA-C.C. art. 1817 reads as follows:
“Art. 1817. Silence and inaction are also, under some circumstances, the means of showing an assent that creates an obligation; if, after the termination of a lease, the lessee continue in possession, and the lessor be inactive and silent, a complete mutual obligation for continuing the lease, is created by the act of occupancy of the tenant on the one side, and the inaction and silence of the lessor on the other.