IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

———————

No. 00-30020

———————

TAITA CHEMICAL COMPANY, LTD.,

Plaintiff-Counter Defendant-Appellant-Cross Appellee,

versus

WESTLAKE STYRENE CORPORATION,

Defendant-Counter Claimant-Appellee-Cross Appellant.

———————

Appeal from the United States District Court
for the Western District of Louisiana

———————

March 23, 2001

Before HIGGINBOTHAM and DeMOSS, Circuit Judges, and KENT[*], District Judge.

SAMUEL B. KENT, District Judge:

Plaintiff-Counter Defendant-Appellant-Cross Appellee, Taita Chemical Co., Ltd.

("Taita"), appeals the District Court's grant of summary judgment in favor of Defendant-

Counter Claimant-Appellee-Cross Appellant, Westlake Styrene Corporation ("Westlake").

Westlake cross-appeals, protesting the District Court's grant of a partial summary judgment

[*] District Judge of the Southern District of Texas, sitting by designation.

1

in favor of Taita and the dismissal of its counterclaim.  For the following reasons we affirm in part and reverse in part.

## FACTUAL AND PROCEDURAL BACKGROUND

In 1990, four companies, including Taita, entered into a joint venture to form Westlake.  The joint venture shareholders owned Westlake in the following percentages: (1) Taita--40%; (2) BTR Nylex, Ltd. ("BTR")--20%; (3) the Chao Group--20%; and (4) the Sumitomo Corporation and Sumitomo Corporation of America--20%.[1]  Westlake produces and sells styrene monomer.

On January 15, 1991, Taita and Westlake entered into a contract known as the "Off-Take Agreement."  This long-term agreement was a take-or-pay contract, under which Taita agreed to purchase 40% of Westlake's styrene monomer production capacity each month for the duration of the contract.  Price was to be determined on a monthly basis in accordance with the contract's pricing clause.  This clause provided that each month Taita was to receive the lowest of three alternative prices:

> 4.    Price
> The Contract Price per pound of Product delivered or ordered for delivery, including Deemed Delivery, during each month shall be the U.S. Gulf Coast Styrene Monomer prices, net after all discounts, for contract transactions as last published in each month by DeWitt & Company, Incorporated in its Benzene & Derivatives Newsletter, or the price for such month charged by WSC [Westlake Styrene Corp.] to a consumer under a firm multi-year contract or the posted contract market price for comparable volumes of Product, whichever is lower.  Should such publication cease to be

---

[1]  BTR held a 51% majority interest in Taita.  Therefore, BTR and Taita collectively owned 60% of Westlake.

published, Buyer and Seller shall mutually select other representative publications.

The meaning of this pricing clause and the parties' conduct with respect to its terms lies at the center of this dispute. In essence, Taita argues that Westlake overcharged it for styrene because Westlake did not extend Taita a lower price provided by Westlake to another customer as required under Taita's interpretation of the second pricing mechanism. This second provision states that Taita shall receive "the price for such month charged . . . to a consumer under a firm multi-year contract." The parties have referred to this provision as the "most favored nations" clause, for the obvious reason that it ensures that Taita, as Westlake's largest investor and principal styrene purchaser, will receive the best available price. Westlake disputes Taita's interpretation of the pricing clause, but urges that, in any event, the evidence demonstrates that Taita undeniably acquiesced in Westlake's differing reading of the contract.

A rather substantial factual dissertation is needed in order to lay the groundwork for the Court's otherwise brief discussion. Many of these facts are not overtly disputed. Other facts, however, as well as what inferences should be drawn from the undisputed facts, remain in issue. As this case comes before us following a grant of Westlake's motion for summary judgment, our presentation of the facts is thus intentionally colored, to a degree, by our obligation to view the evidence in the light most favorable to Taita.

The harbinger of this dispute could be seen as early as June 1994. At that time Ken O'Neill ("O'Neill"), then Westlake's president, queried Taita regarding whether Taita would

3

permit Westlake to enter into a long-term contract to sell styrene to another customer at a lower price without Taita asserting its "most favored nations" rights. Taita president Graeme Bulmer ("Bulmer") responded that Taita would immediately demand the lower price in accordance with the contract. Thus, later that year, when Westlake entered into a contract to sell styrene production, the contract included a "meet or release" clause, which excused performance if market prices for styrene fell below an agreed level. Taita and Westlake apparently agreed that such a clause prevented the contract from becoming a "firm multi-year contract" as is required to trigger Taita's "most favored nations" rights. Therefore, despite this foreshadowing, the pricing issue did not ripen until the end of 1994.

Then in December 1994, Westlake's outgoing president, O'Neill, recommended to the Westlake board that it approve several multi-year contracts to sell styrene, including deals with Novacor Chemicals, Inc. ("Novacor") and Cook Composites & Polymers Company ("Cook Composites").[2] The Novacor agreement involved the sale of roughly 25% of the monthly volume that Taita was required to purchase from Westlake, while the Cook Composites arrangement was for less than 10% of Taita's purchase volume. Thus, although Novacor and Cook Composites were both to be purchasing smaller volumes of styrene than was Taita, they nonetheless were to receive lower prices than Taita was paying.

Soon thereafter, Taita, through O'Neill, now its new president, pointed to the Off-

---

[2] Of some interest, at least with respect to Westlake's conspiratorial theory of this case, O'Neill left Westlake to assume the presidency of Taita. At this December board meeting, O'Neill did not explain to the board that these contracts could trigger Taita's right to a lower price. O'Neill has testified that he assumed each board member was aware of such ramifications.

Take Agreement's "most favored nations" clause and demanded that Westlake honor its right to receive the lower price provided to Novacor.[3] Steve Bayless ("Bayless"), Westlake's new president, initially extended the Novacor discount to Taita. On March 29, 1995, however, Bayless changed his stance, basing his reversal upon a legal opinion regarding the meaning of the "most favored nations" clause. Westlake's attorney opined that Taita was entitled to a discount for a "firm multi-year contract" only if the sale was for a quantity "comparable" to Taita's volume. Because Novacor was only purchasing 25% of Taita's amount, Bayless informed Taita that the discount had been granted in error. According to Westlake, it only granted Taita the Novacor price in the first place, because outgoing Westlake president O'Neill informed Bayless that Taita was entitled to the lower price. After apprising Taita of Westlake's self-perceived error, Bayless demanded that Taita remit the amounts it had underpaid for styrene delivered in January and February. At first, Taita did not comply. Taita's internal correspondence indicates that it was contemplating how to best advance its position with regard to the sought-after pricing.[4]

---

[3] The Novacor contract was allegedly closest to completion at this point and as such Taita's complaint in early 1995 was based upon the Novacor contract, rather than the Cook Composites agreement that forms the basis for Taita's lawsuit.

[4] It seems that Taita expressed uncertainty regarding whether the Novacor contract had been formally signed, even though shipments to Novacor were ongoing. Taita allegedly did not want to press its pricing claim too vigorously until it knew that the Novacor sale was a "firm multi-year contract" that would trigger the "most favored nations" clause. In this regard it is helpful to note, as set forth above, that prior agreements by Westlake to sell styrene at lower prices had included a "meet or release" clause, which excused performance if market prices for styrene fell too low. Rightly or wrongly, the parties apparently had not viewed such arrangements as "firm multi-year contracts." Thus, Taita believed that only particular types of styrene sales would trigger its "most favored nations" rights.

While Taita dithered and declined to show its hand, Bayless, on May 9, 1995, further corresponded with Taita, arguing that Taita remained in breach of the Off-Take Agreement and, further, threatened to cut off Taita's styrene supply if Taita did not remit the amounts past due. As of May 31, 1995, Taita had not yet paid Westlake, despite indicating that it would do so, albeit under protest. This prompted another facsimile letter from Bayless to Taita, and yet another on June 9, 1995, by which time Taita had fallen further behind on its payments. At this juncture, Taita finally acceded to Bayless' request, becoming current and paying invoices in full as they came due. Taita's payments did not, however, specifically indicate that they were being made "under protest." Taita nevertheless contends that its compliance with Bayless' request, and its continued payment of invoices as received, did not indicate any agreement on its part with the position urged by Westlake. Instead, Taita alleges that it could not risk losing its source of styrene supply at that time, and, moreover, it felt that the pricing issue might have been about to become moot, at least prospectively, in light of a contemplated arrangement between the several Westlake stockholders.[5]

Purportedly, Taita had also chosen to bide its time on the pricing issue until a "firm multi-year contract" was signed and executed, and Westlake in turn refused to supply Taita at the lower price. By September 1995, such a situation had clearly presented itself.

---

[5] The Westlake stockholders were considering whether to take all styrene produced by Westlake under a new proportionate off-take agreement, with each paying the same price. Although this course of action was never ultimately taken, the stockholders allegedly continued to discuss the possibility from April to September 1995, during which time Taita did not wish to rock the boat. In September, however, the bottom fell out of the styrene monomer market, which made it uneconomical for Westlake, and correspondingly its other investors, to pursue this option.

6

Westlake and Cook Composites had signed their contract (mentioned above in the context of the December 1994 board meeting) and pricing was made retroactive to the first of the year.[6] Graeme Bulmer, now Taita's chairman, thus resurrected Taita's protest.

Bulmer wrote Westlake's Bayless to confirm Taita's understanding that the Cook Composites contract provided a more favorable price than Taita was receiving. Bulmer's inquiry, in a September 18, 1995 letter regarding Westlake's proposed 1996 budget, questioned whether Westlake's budget reflected Taita's right to receive the lower price seen in the now finalized, and thus "firm," Cook Composites agreement. Bayless responded that the Cook Composites price was not for a comparable volume, and that he believed that Taita's discount argument had already been considered and rejected earlier in 1995. In this regard, Bayless pointed to Taita's alleged acquiescence in Westlake's position with respect to the previously sought after Novacor contract-based discount.

Several days later, on September 26, 1995, Bulmer responded to Bayless by contending that Taita had only paid the disputed Novacor amounts because the Novacor contract was not "firm," as it had not been formally signed and approved by the Westlake board. Bayless responded with surprise and reiterated Westlake's view that Taita had waived its right to complain by paying the invoices following the parties' prior skirmish over Taita's

_____

[6] The Westlake board approved this contract at its July 21, 1995 meeting, at which time the Taita and BTR board members made no mention of any intention to claim a discount. Westlake now counsels that this silence was momentous, because the lost profit required to give Taita the later demanded discount would have exceeded the total revenue from the Cook Composites deal, an arrangement that would of course accrue to the benefit of only Taita and BTR, and not the other Westlake shareholders.

7

claimed Novacor-based "most favored nations" rights. On October 9, 1995, Bulmer sent a final letter to Bayless in which he noted Taita's disagreement with Westlake's position and indicated that Taita would respond further under separate cover. Bulmer had in fact drafted a harsh letter, on October 3, setting forth Taita's position of objection in detail, but he never sent this letter per the instructions of BTR's managing director Phillip Aiken, who apparently wished to deal with the dispute at an upcoming November 1995 Westlake board meeting. Neither Taita nor BTR raised the pricing issue at this meeting, and Taita's and BTR's board members voted to approve the proposed 1996 budget, which did not include discounts for Taita.[7]

This September and October 1995 round of correspondence was the last formal exchange between the parties on this disputed pricing issue. They continued to negotiate, however, on efforts to terminate the Off-Take Agreement, or for BTR and Taita to divest themselves of their Westlake holdings. Taita alleges that it did not wish to actively press the "most favored nations" pricing issue in late 1995, via litigation or otherwise, because of the sensitivity of these ongoing efforts. Taita does, however, point to evidence purportedly indicating that it had not agreed to Westlake's interpretation of the pricing agreement, and that Westlake, in fact, knew Taita continued to disagree. First, Allen Grassedonio ("Grassedonio"), a BTR employee who worked at Westlake, had created a spreadsheet at the direction of Taita's president, O'Neill, that set forth Westlake's "Potential Favored Nations

---

[7] Again Westlake cries foul, but Taita contends that approving a budget without reference to Taita's potential claim was acceptable accounting and thus not inconsistent with its protest.

8

Liability" to Taita. Grassedonio testified in his deposition that he placed copies of these spreadsheets in the in-box of Westlake's president on at least two occasions during 1995 and 1996. Westlake's two presidents during this time frame, Bayless and Dr. Ron Gilbert, deny receiving these reports. Grassedonio, however, has testified that he confirmed by conversation, at least with Bayless, that this report was received. Additionally, Grassedonio claims to have overheard Bayless having a conversation that he believed concerned the spreadsheet's content with another Westlake executive. Taita also points to the March 1996 report of the Westlake Evaluation Committee. This report sets forth valuation scenarios in contemplation of the Chao Group's purchase of Taita's and BTR's shares in Westlake. Indisputably this report states that one valuation "assumes [C]ook pricing for Taita."[8] Finally, Taita notes the uncharacteristic lack of a release in the parties ultimate agreement to part ways.

However, despite Taita's contention that it never agreed with Westlake's interpretation of the pricing clause, and in stark juxtaposition with its cited evidence of non-acquiescence, Taita continued to pay Westlake's invoices as they came due. It is thus undisputed that for the next fourteen months, from November 1995 - December 1996, Taita paid each undiscounted invoice it received.

---

[8] The parties sharply disagree about the meaning of this report. The District Court adopted Westlake's view that this report actually contemplated a scenario in which Taita would purchase the Chao Groups' interest and then restructure the Off-Take Agreement in a manner similar to the Cook Composites deal. Hence the "Cook" reference. This is certainly plausible, but so too is Taita's position which we are bound to give credence to at the summary judgment stage.

In December 1996, BTR finally sold its, and Taita's, combined 60% interest in Westlake to the Chao Group. As a result of this sale, the Off-Take Agreement was effectively canceled, with BTR agreeing to continue purchasing styrene from Westlake under a different pricing formula. As mentioned, the termination agreement did not include any type of release of claims as between the parties.

Soon thereafter, BTR sold Taita, and in the summer of 1997, Taita's new shareholders became aware of the potential claim that Taita had against Westlake for styrene overcharges. Taita then filed suit, on December 9, 1997, alleging $18 million dollars in damages. Taita advanced claims for: (1) breach of contract, premised on Westlake's failure to extend Taita its "most favored nations" discount based upon the Cook Composites contract and (2) payment of a thing not owed.[9] In the District Court, below, Taita moved for partial summary judgment regarding the meaning of the Off-Take Agreement's pricing clause. On this issue, the District Court agreed with Taita and granted a partial summary judgment. Westlake cross-appeals this disposition. Taita's victory, however, was merely pyrrhic, because the District Court held that Westlake had established several affirmative defenses as a matter of law. Westlake successfully argued that Taita lost its right to benefit from the "most favored

_____

[9] Taita's amended complaint also set forth claims of bad faith, duress, fraud, unjust enrichment, and an alternative breach of contract claim based upon the "DeWitt" pricing mechanism. Taita's opening brief does not address error with respect to these causes of action. Accordingly, we find that Taita has waived these claims. See Carmon v. Lubrizol Corp., 17 F.3d 791, 794 (5th Cir. 1994) ("We liberally construe briefs in determining issues presented for review; however, issues not raised at all are waived."). Taita's efforts by way or its reply brief to preserve error on these claims is unavailing. See Cavallini v. State Farm Mut. Auto Ins. Co., 44 F.3d 256, 260 n.9 (5th Cir. 1995) ("[W]e do not consider issues raised for the first time in a reply brief.")

nations" pricing clause through a modification, by waiver or by estoppel. Taita appeals the grant of summary judgment on these affirmative defenses. Finally, Westlake had asserted a cross claim for breach of fiduciary duty. The District Court dismissed this cross claim as mooted by the summary judgment. Westlake cross-appeals this ruling.

## DISCUSSION

### I. *Standard of Review*

We review a district court's grant of summary judgment de novo. See Geoscan, Inc. of Texas v. Geotrace Techs., Inc., 226 F.3d 387, 390 (5th Cir. 2000). Summary judgment is appropriate if no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552-53, 91 L. Ed. 2d 265 (1986). When a motion for summary judgment is made, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). Issues of material fact are "genuine" only if they require resolution by a trier of fact. See id. at 248, 106 S. Ct. at 2510. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. Only disputes over facts that might affect the outcome of the lawsuit under governing law will preclude the entry of summary judgment. See id. at 247-48, 106 S. Ct. at 2510. If the evidence is such that a reasonable fact-finder could find in favor of the nonmoving party, summary judgment should not be granted. See id.; see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106

S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986). Determining credibility, weighing evidence, and drawing reasonable inferences are left to the trier of fact. See Anderson, 477 U.S. at 255, 106 S. Ct. at 2513.

Procedurally, the party moving for summary judgment bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp., 477 U.S. at 323, 106 S. Ct. at 2553; see also Fed. R. Civ. P. 56(c). The burden then shifts to the nonmoving party to establish the existence of a genuine issue for trial. See Matsushita, 475 U.S. at 585-87, 106 S. Ct. at 1355-56; Wise v. E.I. DuPont de Nemours & Co., 58 F.3d 193, 195 (5th Cir. 1995). The Court must accept the evidence of the nonmoving party and draw all justifiable inferences in favor of that party. See Matsushita, 475 U.S. at 585-87, 106 S. Ct. at 1355-56. However, to meet its burden, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts," but instead, must "come forward with 'specific facts showing that there is a genuine issue for trial.'" Id. at 586-87, 106 S. Ct. at 1355-56 (quoting Fed. R. Civ. P. 56(e)).

## II. *The Pricing Clause*

Westlake argues, by way of cross-appeal, that the District Court erred in determining that the pricing clause in the Off-Take Agreement is unambiguous. The parties agree that the pricing formula clearly provides for three distinct means of calculating the appropriate price per pound of styrene monomer. Moreover, the agreement also indisputably sets forth

that Taita was to pay only the lowest of these three plausible prices. What is at issue between the parties is whether the phrase "for comparable volumes of product" was intended to modify each of the three possible pricing mechanisms, or just the third means of price calculation. Westlake argues that the "comparable volumes" language modifies not only the third pricing mechanism which it follows, but also the second pricing calculation for "a firm multi-year contract." Taita argues that the District Court properly determined that the language modifies only the third mechanism, which is not a basis for Taita's overcharge claim.

The parties agree that Louisiana law governs our analysis in this diversity of citizenship case. In Louisiana, the interpretation of an unambiguous contract is an issue of law for the court. See Texas E. Transmission Corp. v. Amerada Hess Corp., 145 F.3d 737, 741 (5th Cir. 1998). A court interpreting a contract shall determine the "common intent" of the parties. La. Civ. Code Ann. art. 2045. However, "[w]hen the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." Id. at art. 2046. Therefore, when the contract is not ambiguous, this Court lacks the authority to look beyond the four corners of the document. See Texas E. Transmission Corp., 145 F.3d at 741. The District Court found the language of the pricing clause "unequivocal." We agree. The "comparable volumes" language clearly and unambiguously modifies only the third pricing mechanism, which is not relevant to the

13

present dispute.[10]  We therefore affirm the ruling of the District Court granting partial summary judgment regarding the meaning of the pricing clause.

### III.  *Westlake's Affirmative Defenses*

After granting the partial summary judgment in Taita's favor regarding the meaning of the pricing clause, the District Court turned to Westlake's various asserted affirmative defenses: modification, waiver and estoppel.  The District Court determined that Westlake had proven each of these three defenses as a matter of law, and thus granted summary judgment.

### A.  *Modification*

The District Court held below, and Westlake now argues on appeal, that Taita's conduct served to modify the Off-Take Agreement.  The Louisiana Civil Code provides that a contract is an "agreement by two or more parties whereby obligations are created, modified, or extinguished."  La. Civ. Code Ann. art. 1906.  In order for a contract to be formed, both parties must consent.  See id. at art. 1927.  This consent may be manifested by a writing, or be made orally, or by "action or inaction that under the circumstances is clearly indicative of consent."  Id.  It follows that silence may also be a form of inaction indicating

---

[10] Moreover, the DeWitt Newsletter price, which is the first pricing mechanism, apparently did not publish volume information.  The "comparable volumes" language, therefore, could not have been applicable to all three mechanisms.  Accordingly, it is apparent that reading the clause in the manner urged by Westlake would be inconsistent with not only English grammar, but reality.  In a tortured recognition of the inherent rhetorical flaws in its argument, Westlake now argues that the "comparable volumes" language modifies only the second and third pricing mechanisms.  We reject this argument.

consent, provided that the silence "leads the offeror to reasonably believe that a contract has been formed." Id. at art. 1942. Westlake, as the party asserting modification, "must prove the facts or acts giving rise to the nullity, modification, or extinction." Id. at. art. 1831; see also Allan v. Arnold, 673 F.2d 767, 669-70 (5th Cir. 1982); L & A Contracting Co., Inc. v. Ram Indus. Coatings, Inc., 762 So. 2d 1223, 1232 (La. Ct. App. 2000); Big "D" Dirt Servs., Inc. v. Westwood, Inc., 653 So. 2d 604, 608 (La. Ct. App. 1995); Bank of Louisiana in New Orleans v. Campbell, 329 So. 2d 235, 237 (La. Ct. App. 1976). Moreover, it is well established that even if the written contract contains a provision requiring that all modifications be in writing, as does the Off-Take Agreement, either oral agreement or conduct can nonetheless prove modification. See Durham, Inc. v. Vanguard Bank & Trust Co., 858 F. Supp. 617, 621 (E.D. La. 1994); Wisinger v. Casten, 550 So. 2d 685, 687 (La. Ct. App. 1989); Campagna v. Smallwood, 428 So. 2d 1343, 1348 (La. Ct. App. 1983); Pelican Elec. Contractors v. Neumeyer, 419 So. 2d 1, 5 (La. Ct. App. 1982); Pamper Corp. v. Town of Marksville, 208 So. 2d 715, 717 (La. Ct. App. 1968). In all instances, however, the party urging modification must establish that parties mutually consented to the agreement as modified. See La. Civ. Code Ann. art 1927; Society of the Roman Catholic Church of the Diocese of Lafayette, Inc. v. Interstate Fire & Cas. Co., 126 F.3d 727, 737 (5th Cir. 1997); L & A Contracting, 762 So. 2d at 1232.

The issue therefore becomes whether Taita consented either expressly or impliedly to a modification of the pricing clause, because modification requires a meeting of the minds. See La. Civ. Code Ann. art 1927; Interstate Fire & Cas. Co., 126 F.3d at 737; L & A

15

Contracting, 762 So. 2d at 1232. Obviously, the record reflects a great amount of evidence favorable to Westlake in this regard. Taita paid some fourteen invoices after making its last clear complaint regarding the styrene's price. Never, in submitting any of its payments for these invoices, did Taita overtly and contemporaneously note that it was in any manner paying "under protest." Taita and BTR, through their votes on the Westlake board, also voted to approve a budget that they knew did not reflect providing Taita with a price discount. However, Taita does introduce evidence purporting to show that it had not capitulated to Westlake's will on this issue, and that Westlake moreover knew it had not so agreed. In this regard Taita points principally to: its prior protestations regarding the Novacor contract; its "last word" on the issue, Bulmer's October 9, 1995 letter; the Grassedonio spreadsheet; and the Evaluation Committee's March 1996 pricing scenarios. This evidence, taken as a whole, creates a genuine issue of material fact as to whether Taita agreed to modify the "most favored nations" pricing clause.[11] See Illinois Cent. Gulf R.R. Co. v. International Harvester Co., 368 So. 2d 1009, 1013 (La. 1979) (holding that in some instances the acceptance of payments without protest for extended periods of time will not

---

[11] Westlake makes much of two Louisiana cases in which the repeated paying of increased invoiced amounts was held to indicate a modification of the parties' pricing agreement. See Ceco Corp. v. Mid-Gulf Constr., Inc., 396 So. 2d 474, 476-78 (La. Ct. App. 1981); Stupp v. Con-Plex, Div. of U.S. Indus., 344 So. 2d 394, 396 (La. Ct. App. 1977). These cases, however, are distinguishable. In both of these cases, the buyer paid invoices without any protest until after all needed goods had been delivered. Taita, by contrast, has set forth some evidence of timely protest, from which a jury could conclude there had not been a modification. See Illinois Cent. Gulf, 368 So. 2d at 1012-13 (noting that the question of modification is "essentially factual" and affirming a trial court's determination that a lease had not been modified by accepting sixteen payments without complaint).

16

always constitute modification).  Moreover, as Taita contends, it seems that even if a modification occurred, Taita may nonetheless have been overcharged for styrene up to the time of such modification.  The District Court did not address this issue below, and we mention it now only to stimulate further consideration of this issue on remand.

B.    *Waiver*

Waiver is defined as the "intentional relinquishment of a known right, power, or privilege."  Steptore v. Masco Constr. Co., 643 So. 2d 1213, 1216 (La. 1994); see also Tate v. Charles Aguillard Ins. & Real Estate, Inc., 508 So. 2d 1371, 1373 (La. 1987).  In order for waiver to occur there must first be an existing right and knowledge of that right's existence.  See Steptore, 643 So. 2d at 1216.  A party may then waive that right through either: (1) "an actual intention to relinquish it," or (2) "conduct so inconsistent with the intent to enforce the right as to induce a reasonable belief that it has been relinquished."[12]  Id.  See also Gilbert v. B.D.O.W.S., Inc., 764 So. 2d 313, 320  (La. Ct. App. 2000).  The party asserting waiver,

---

[12] Taita contends that Steptore and Tate have eased the traditional burden of proving waiver, by providing that waiver may be established by the inducement of a reasonable belief even absent actual intent to waive.  According to Taita, these cases must be considered in the context of insurance coverage law, a situation in which the parties have inherently unequal bargaining power that the Louisiana Supreme Court obviously sought to ameliorate.  We disagree.  It may be true that the court expanded its definition of waiver to alleviate inequities in the insurance context, but it nonetheless set forth a general concept that this Court has previously found broadly applicable.  See Specialty Healthcare Mgmt., Inc. v. St. Mary Parish Hosp., 220 F.3d 650, 656, 658 (5th Cir. 2000).  Moreover, the most recent waiver pronouncement by a Louisiana appellate court undermines Taita's argument.  See Rogers v. Horseshoe Entm't, 766 So. 2d 595, 601 (La. Ct. App. 2000) (applying Steptore to the terms of an option contract).  We see no reason to depart from the Louisiana Supreme Court's pronouncement of law that has been followed outside of the insurance law context.  Moreover, we are bound by the earlier panel decision of this Court.  See F.D.I.C. v. Abraham, 137 F.3d 264, 267-69 (5th Cir. 1998) (discussing the generally binding effect of Erie "predictions" by an earlier panel).

here Westlake, must bear the burden of proof on the issue. See F.D.I.C. v. Duffy, 47 F.3d 146, 150 (5th Cir. 1995); Tate, 508 So. 2d at 1375.

Westlake must therefore establish either that Taita: (1) intended to waive its rights under the contract or (2) acted in a manner so inconsistent with this right as to induce a reasonable belief in Westlake that Taita did intend to waive its right. Any effort by Westlake to establish that Taita intended to waive its "most favored nations" rights fails at the summary judgment stage for the same reasons that Westlake's modification defense fails. Taita has introduced enough evidence to create a fact issue on what it intended with respect to the pricing clause. The second means of proving waiver, by conduct inducing a reasonable belief, likewise fails at the summary judgment stage. This is so because Taita's objective evidence of its own intent is also probative of whether its conduct was so inconsistent with its contractual rights as to induce a belief in Westlake of waiver; again creating a fact issue. Moreover, Westlake fails to carry its summary judgment burden of demonstrating the reasonableness of its beliefs. In this regard, we refer back to the untenable pricing clause interpretation advanced by Westlake, which underlies this dispute. A reasonable juror could conclude that Westlake could not have reasonably believed that Taita had waived it right to millions of dollars in overcharges based upon Westlake's audacious legal opinion. We therefore reverse the District Court's waiver ruling.

C.    *Equitable Estoppel*

The Louisiana Supreme Court has defined equitable estoppel as "'the effect of the voluntary conduct of a party whereby he is precluded from asserting rights against another

18

who has justifiably relied upon such conduct and changed his position so that he will suffer injury if the former is allowed to repudiate the conduct.'" Morris v. Friedman, 663 So. 2d 19, 25 (La. 1995) (quoting John Bailey Contractor v. State Dep't of Transp. & Dev., 439 So.2d 1055, 1059 (La. 1983)). The doctrine, in proper circumstances, will prevent a party "from taking a position contrary to his prior acts, admissions, representations, or silence." John Bailey, 439 So. 2d at 1059-60; accord Wilkinson v. Wilkinson, 323 So. 2d 120, 126 (La. 1975). Equitable estoppel thus has three elements: "(1) A representation by conduct or work; (2) Justifiable reliance thereon; and (3) A change of position to one's detriment because of the reliance." John Bailey, 439 So. 2d at 1059-60. However, equitable estoppel is disfavored and should only be applied as needed to avoid injustice. See Morris, 663 So. 2d at 25-26; John Bailey, 439 So. 2d at 1059. Accordingly, "a party having the means readily and conveniently available to determine the true facts, but who fails to do so, cannot claim estoppel." John Bailey, 439 So. 2d at 1060.

Westlake's allegations in support of equitable estoppel are essentially as follows. Taita's conduct amounted to a representation that it had no right to "most favored nations" pricing based upon the sale of a non-comparable volume of styrene monomer. Westlake justifiably relied upon this representation to its detriment, in that it permitted Taita and BTR to sell their interests in Westlake to the Chao Group. This sale terminated the Off-Take Agreement, at a price that did not reflect a possible claim for overcharges by Taita. Thus, Westlake's present shareholders were left with full liability for a claim for which Taita and BTR, as stockholders, would have born 60% of the financial burden.

19

Several items counsel against the District Court's decision to grant Westlake's Motion for Summary Judgment on this issue. Taita has advanced evidence, as discussed above, that Westlake knew that it had not dropped the overcharge issue. Additionally, under Louisiana law, Westlake cannot invoke equitable estoppel against Taita if Westlake could have readily ascertained the true facts with respect to Taita's ongoing position regarding the "most favored nations" clause. This duty to investigate is not a hollow pronouncement of horn-book law in Louisiana. Rather, Louisiana courts regularly deny estoppel based, at least in part, on failures in this regard. See Knippers v. Lambard, 620 So. 2d 1368, 1375 (La. Ct. App. 1993) (holding that plaintiff seeking estoppel had failed to ensure that document had been received); Robbins Tire & Rubber Co., Inc. v. Winnfield Retread, Inc., 577 So. 2d 1189, 1192 (La. Ct. App. 1991) (holding that a party seeking estoppel had an obligation to determine the meaning of other party's silence); Duthu v. Allements' Roberson Mach. Works, 393 So. 2d 184, 186-87 (La. Ct. App. 1980) (noting that defendant's failure to reasonably question plaintiff's former husband or to check public records, prevented estoppel based on plaintiff's payment of a judgment not owed); Twillie v. H.B. Zachry Co., 380 So. 2d 747, 751 (La. Ct. App. 1980) (rejecting estoppel because plaintiff could have sent a letter or made a phone call to determine a defendant's place of business). Thus, to the extent that Westlake argues that Taita was impermissibly silent regarding the overcharges, one must also ask whether Westlake had a culpable role in the misunderstanding. Giving proper deference to Taita on the inferences to be drawn from the evidence produced, it strikes us that perhaps Westlake also was "laying behind the log." For instance, it seems unusual that, in dissolving

20

the Off-Take Agreement, Westlake did not obtain a release from Taita regarding potential claims of whatever nature. Such releases are standard business practice even in situations where no dispute was ever manifest. Moreover, Westlake's failure to ever so much as ask Taita if it had come to agree with Westlake's view of the pricing clause further undermines the justifiableness required of Westlake's reliance. In sum, Taita has introduced enough evidence, when viewed in a properly deferential manner, to create a material issue of fact regarding equitable estoppel. Accordingly, we respectfully reverse the District Court's decision on this issue.

## IV. *Payment of a Thing Not Owed*

Taita also asserted a code-based cause of action for "payment of a thing not owed." See La. Civ. Code Ann. art. 2299. The District Court determined that Westlake's affirmative defenses barred this claim for the same reasons that these defenses barred Taita's breach of contract claim. Because we reverse the District Court's summary judgment based upon the affirmative defenses, we are compelled to reverse the dismissal of Taita's payment of a thing not owed cause of action.[13]

---

[13] The District Court ruling also discussed a difficult issue regarding a January 1, 1996 revision to the Louisiana Civil Code. See La. Civ. Code. Ann. arts. 2298-2305. Westlake argues that prior to this revision, a party could only recover payments that were not knowingly made in error. By contrast, post-revision, the code establishes that unknown error is not a prerequisite to recovery. See id. We decline to reach the propriety of the District Court's discussion of this issue. It seems to us that in a case involving an express contract such as this, the viability of the code-based claim is congruent with the primary claim for breach of contract. Thus, there seems to be no reason to make an unneeded prediction of Louisiana law when Taita's recovery under Article 2299 cannot possibly exceed the amount it might recover on its breach of contract claim. We note, however, that the District Court's discussion ignores a critical accrual issue: Taita made payments both before and after the code change. Thus, to the extent that Taita's Article 2299

21

**CONCLUSION**

The District Court properly granted partial summary judgment in favor Taita with respect to the proper reading of the Off-Take Agreement's pricing clause. We therefore **AFFIRM** the District Court's decision in this regard.

With respect to the affirmative defenses advanced by Westlake, however, the District Court, despite a protracted, meticulous and remarkably workmanlike effort, erred in granting summary judgment. We simply cannot say with the requisite certitude that Westlake has carried its summary judgment burden of establishing any one of its affirmative defenses as a matter of law. The imprimatur of a jury is important in a complex case such as this, even if said jury ultimately reaches the same conclusion as that seen in the District Court's able analysis. We therefore **REVERSE** the District Court's grant of summary judgment that was based upon Westlake's asserted affirmative defenses. We likewise **REVERSE** the dismissal of Westlake's counterclaim, which is no longer moot following our disposition. This matter is hereby **REMANDED** for proceedings consistent with this opinion.

---

claim has some importance that we have overlooked, the accrual issue would need to be addressed on remand.