IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 8, 2008

Charles R. Fulbruge III
Clerk

No. 07-30746

MIDWEST TOWER PARTNERS LLC, doing business as Liberty Towers

Plaintiff - Appellee

v.

GUARANTY BROADCASTING COMPANY OF BATON ROUGE LLC, doing business as WNXX - FM 104.5

Defendant - Appellant

Appeal from the United States District Court
for the Middle District of Louisiana
3:05-CV-1077

Before KING, HIGGINBOTHAM, and SOUTHWICK, Circuit Judges.

PER CURIAM:[*]

Midwest Tower Partners was granted judgment on the pleadings, dismissing Guaranty Broadcasting Company's counterclaim. We affirm.

I. BACKGROUND

The parties here are successors in interest to a license agreement on a radio broadcast tower. The initial agreement was executed in 1998. Midwest

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

is the successor to the grantor of the license, Guaranty to the grantee.  The 1998 agreement included this provision setting the rental fee:

> In consideration of the license granted to Licensee hereunder, Licensee shall pay to Licenser a monthly fee of $2,000 (the base fee) during the term of this Agreement, provided, however, that the first five years of this agreement the base fee amount shall be reduced by 50% of the amount of any rental agreement with any subsequent users to a floor of $1,000 monthly. At the end of the first five years of this agreement, the then monthly fee shall automatically increase 20% every five years and as follows in connection with any extensions of the initial term of this agreement: (a) 20% for first extension term; (b) 20% for second extension term; and (c) 20% for third extension term.

In 2003, Guaranty obtained a loan from Whitney National Bank.  Whitney required Guaranty to obtain an estoppel certificate from Midwest for assurance that there were no defaults under the lease and that Midwest consented to Guaranty's assignment of collateral to secure Guaranty's obligations under the lease.  Whitney Bank's lawyer originally drafted the estoppel certificate.  The 2003 document is two pages and entitled "<u>ESTOPPEL CERTIFICATE AND CONSENT</u>."  According to Guaranty's pleadings, Midwest caused the following language to be inserted into the document:

> The current rent under the Lease is $1,000.00 per month with escalation of 20% every five years, and all rent and other charges and fees have been paid current through the end of November, 2003. Tenant's rent is reduced during the first five (5) years of the Lease by 50% of the amount of any rental agreement with any subsequent users to a floor of $1,000.00 monthly, therefore as of June 1, 2004, Tenant's rent will again be $2,000.00 per month plus a 20% escalation.

Guaranty then signed the document.

After the document was signed, the parties began to dispute the correct amount of rent.  Guaranty argued that the rent was $1,000 under the original lease and the 2003 change to $2,000 was a mistake.  Under protest, Guaranty

paid the amount Midwest demanded. Midwest filed the complaint in this case requesting a declaration that the amount of rent was set by the 2003 document, not the original 1998 agreement. Guaranty counterclaimed with an allegation that it had been unaware of the now-contested provision, would not have agreed to it, and that the change in rent amount should be found to be invalid.

Midwest filed a motion for judgment on the pleadings and a motion to dismiss Guaranty's counterclaim. The district court granted Midwest's motions. Guaranty timely appealed. We review this judgment on the pleadings de novo. In re Katrina Canal Breaches Litig., 495 F.3d 191, 205 (5th Cir. 2007).

## II. DISCUSSION

### 1. The Estoppel Certificate and Consent

Guaranty's first three allegations of error are addressed together: 1) the meaning and effect of the 2003 Estoppel Certificate and Consent were not proper subjects for judgment on the pleadings because the result was a modification of a lease; 2) the district court erred in concluding that the implicit intent of the 2003 agreement was to modify the terms of the lease; and 3) the district court's analysis of unilateral mistake law was flawed.

Because this was a judgment on the pleadings, we examine with some care the assertions in the pleadings. In its answer, amended answer, and its opposition to Midwest's motion for judgment on the pleadings, Guaranty argued that the contested provision in the 2003 document was inserted by Midwest and that Guaranty had no intention to agree to such terms.

Specifically, Guaranty's answer stated that Midwest had "executed the Estoppel Certificate and Consent by mistake as it was and is inconsistent with the actual intent of the original parties to the License/Lease Agreement," i.e., the parties to the 1998 agreement to whom the litigants are the successors. Later in the answer, a counterclaim asserted that the mutual intent of the original parties was to make $1,000 the rent amount: "To the extent the language of the

written agreement does not conform to the actual intention of the original contracting parties," it should be reformed.

Guaranty, in an amended answer, restated that it "executed the Estoppel Certificate by mistake to the extent it contained provisions relative to rent which are inconsistent with the terms of the Lease," and that there was no meeting of the minds between Guaranty and Midwest. In the same pleading, Guaranty asserted that Midwest "specifically inserted" into the Estoppel Certificate the language about $2,000 being the rent amount, without informing Guaranty of its decision to amend the lease.

A similar allegation appears in Guaranty's opposition to Midwest's motion on the pleadings. Guaranty alleged that Whitney Bank initially drafted the 2003 Estoppel Certificate, but that Midwest then requested the provision that the rent would be $2,000 before adjustments. It is also asserted that Midwest knew the original intent of the parties to the 1998 lease was to make the rent $1,000. There is no allegation that Midwest ever made a mistake.

Guaranty's constant position in the district court was that its mistake in signing the Estoppel Certificate meant that there was no meeting of the minds. The district court accurately characterized these pleadings as setting out Guaranty's position that the parties never mutually consented to the new rental amount. Guaranty asserts that Midwest was aware of the change and had asked for the language to be added after getting Whitney Bank's initial draft.

The claim, then, is that a unilateral mistake occurred. There is no claim that Midwest was engaged in fraudulent conduct. Under the law of Louisiana that we must apply to this diversity case, "a contract is an 'agreement by two or more parties whereby obligations are created, modified, or extinguished.'" Taita Chem. Co. v. Westlake Styrene Corp., 246 F.3d 377, 386 (5th Cir. 2001) (quoting La. Civ. Code Ann. art. 1906). No distinction is made between contracts that

create, modify, or extinguish obligations so long as both parties consent. Taita, 246 F.3d at 386-87 (discussing Louisiana law).

Louisiana law recognizes four requirements for contract formation: (1) the parties' capacity to contract; (2) the parties' mutual consent, freely given; (3) a definite object for the contract; and (4) a lawful purpose to the contract. Thebner v. Xerox Corp., 480 So. 2d 454, 457 (La. Ct. App. 1985) (citing La. Civ. Code Ann. arts. 1918, 1927, 1966, and 1971). The district court found and we agree that the 2003 document was a contract, whether seen as a modification of an earlier agreement or as something else. Because of that conclusion, we need not look beyond the Estoppel Certificate and Consent to determine the intent of these sophisticated parties.

A contract may have multiple principal causes, error as to any one of which could vitiate consent. See La. Civ. Code Ann. arts. 1949, 1950. On the question of the cause for the 2003 agreement, the district court stated that Guaranty argued that "[t]he only reason the Estoppel Certificate was ever executed was to satisfy Whitney that the Lease was current and there were no events of default in existence." On appeal, Guaranty argues that the amount of rent for the tower lease was also a principal cause of the 2003 agreement. Specifically, Guaranty argues that although its principal cause in executing the Estoppel Certificate and Consent was to obtain financing, given the lengthy term of the lease, "if the parties had intended to amend it to [increase Guaranty's rent], this would rise to the level of a principal cause."

We do not find that identifying the principal cause(s) of the 2003 agreement to be essential. Unilateral error - even as to a principal cause of a contract - does not automatically result in a finding that the mistaken party did not consent. "Error can invalidate a contract if it is related to the principal cause, or motive, for making the agreement, [but] error on the part of one party may not invalidate the agreement if the cause of the error was the complaining

5

party's inexcusable neglect in discovering the error." Scott v. Bank of Coushatta, 512 So. 2d 356, 362 (La. 1987). Courts have properly "rejected the defense of unilateral error where the complaining party, through education or experience, had the knowledge or expertise to easily rectify or discover the error complained of." Id. at 363.

The 2003 agreement was only two pages before the signature page; it was executed by sophisticated business entities. "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." Dugas v. Modular Quarters, Inc., 561 So. 2d 192, 198 (La. Ct. App. 1990) (citation omitted). No one suggests that the language in the document was ambiguous. Rather, Guaranty argues that it overlooked the change when signing the document. However, the alleged error here was too easily found to justify a finding of unilateral mistake.

We acknowledge that we are reaching that conclusion in hindsight. Most of us are eminently capable of making easily avoided mistakes. Yet every error that the reality of the human condition can explain does not require the law of Louisiana to forgive. This simple error was not what state law defines as a unilateral mistake that would justify setting aside the agreement.

The 2003 document was a contract, binding on the parties. They possessed the capacity to contract and executed the document. The object of the agreement was to enable Guaranty to secure the financing it sought from Whitney Bank. That was a lawful purpose. Consideration is not required for a contract to be binding. La. Civ. Code Ann. art. 1967 cmt. (c).

The 2003 document is a valid contract under Louisiana law, not in any way invalidated by whatever mistake might have been made.

2. Default on the Lease

Guaranty's fourth and fifth issues, that the district court implicitly held Guaranty was in default and the judgment is ambiguous as to that issue, have

no merit. The complaint did not raise any question of default. Midwest's brief confirms that it "never requested that the court declare Guaranty in default under the lease. Nor did Midwest seek a factual finding of default at any time during the proceedings below." Instead, the suit was to declare the rights of the parties, not the possibility of their defaults.

The district court never ruled on the issue of default because it was not an issue advanced in Midwest's pleadings to the court.

We AFFIRM the judgment.